Bill JACKSON, Husband; Juanita Jackson, Wife, Appellants/Cross-appellees,

v.

SWIFT ECKRICH, INC., Appellee/Cross-appellant.

Con Agra, successor in interest to Swift Eckrich, Inc., of Huntsville, Arkansas; Dick Wolf Individually and as Agent and Employee of Swift Eckrich, Inc. of Huntsville, Arkansas; Russ May, Individually and as Agent and Employee of Swift Eckrich, Inc. of Huntsville, Arkansas; Paul Prudhomme, Individually and as Agent and Employee of Swift Eckrich, Inc. of Huntsville, Arkansas, Defendants.

Nos. 93–3874, 93–3971.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 17, 1994.

Decided April 28, 1995.

James G. Lingle, Rogers, AK, argued (Clay Fulcher, on the brief), for appellant.

Charles L. Harwell, Springdale, AK, argued (James E. Crouch, on the brief), for appellees.

Before RICHARD S. ARNOLD, Chief Judge, BRIGHT, Senior Circuit Judge, and McMILLIAN, Circuit Judge.

McMILLIAN, Circuit Judge.

Bill[1] and Juanita Jackson, husband and wife, appeal from a final order entered in the United States District Court[2] for the Western District of Arkansas, granting partial judgment as a matter of law to appellee/cross-appellant Swift Eckrich, Inc., on grounds that the doctrine of primary jurisdiction required the Secretary of Agriculture to determine whether an alleged bargaining practice of Swift Eckrich violated the Packers and Stockyards Act (PSA), 7 U.S.C. §§ 181–228. *Jackson v. Swift–Eckrich, Inc.,* 836 F.Supp. 1447 (W.D.Ark.1993). For reversal, the Jacksons argue the district court erred in (1) holding the doctrine of primary jurisdiction applied, (2) improperly substituting its judgment for that of the jury, and (3) improperly reducing the judgment. On cross-appeal, Swift–Eckrich argues the district court erred in holding (1) the Sherman Act statute of limitations period applied to claims under the PSA, (2) the doctrine of

---

1. Bill Jackson has deceased since the filing of the notice of appeal in this case.

2. The Honorable H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas.

primary jurisdiction did not apply to all claims brought under the PSA, and (3) Swift Eckrich was not entitled to judgment as a matter of law on the Jacksons' claims of breach of contract and fraud. For the reasons discussed below, we affirm the judgment of the district court.

## I. BACKGROUND

This case is about turkey growing. In 1985, the Jacksons signed their first contract to grow turkeys for Swift Eckrich, a poultry processing company with a plant in Huntsville, Arkansas. From 1981–1985, the Jacksons raised turkeys for another company, but they decided to switch to Swift Eckrich because of a desire for greater profits. Swift Eckrich, unlike most poultry processors, is not a totally integrated enterprise. Swift Eckrich had a practice of selling young turkeys, poults, to independent growers who would raise the turkeys and then sell them back to Swift Eckrich (approximately seventeen to nineteen weeks later) when the turkeys reached a marketable size. Swift Eckrich's sale and re-purchase of the turkeys was provided for in the same contract. The contract also contained terms regarding the manner in which the turkeys were to be raised. There were, however, two versions of the growing contract which Swift Eckrich offered to independent growers, a "floor" contract and a "performance" contract. Each type of contract had a one-year term. The Jacksons signed a series of six one-year floor contracts with Swift Eckrich between 1985 and 1991.

The floor contract was a market-related contract. The price per pound Swift Eckrich paid the growers was a function of the grain and turkey markets. Growers had to pay feed costs themselves, but they had the potential to make more money under the floor contract because of the possibility of favorable market movements. The risk of loss was higher with this contract than with the performance contract. The performance contract was a cost-plus contract. Under the performance contract, a grower was reimbursed for his or her actual costs of raising the turkeys, plus so much based on performance. In 1985, the Jacksons had a choice of a performance contract or a floor contract. They chose the floor contract. They maintain, however, they were initially told they would have the opportunity to choose each year the type of contract under which they would grow turkeys.

The Jacksons continued to grow turkeys for Swift Eckrich under a floor contract until, according to Bill Jackson's testimony, they requested a performance contract for the 1989 growing year. Swift Eckrich's procurement manager, Dick Wolf, testified that he could not recall such a request from the Jacksons. Wolf further testified that Swift Eckrich had reached a point where it was only offering performance contracts to producer growers, i.e. those growers who had their own feed mills, or could otherwise control the cost of their feed. Because the Jacksons did not have a feed mill or could not otherwise control their feed costs, their request for a performance contract was denied. On August 19, 1988, the Jacksons signed a floor contract for the 1989 growing year. Bill Jackson also testified that Swift Eckrich denied his request for a performance contract in 1990 as well. The Jacksons nonetheless signed floor contracts in 1990 and 1991. The Jacksons argue that Swift Eckrich's failure to offer them a choice of contracts constituted a violation of the PSA provisions which prohibit unfair, unjustly discriminatory, or deceptive practices, and undue or unreasonable preferences. *See* 7 U.S.C. § 192(a), (b).

In this lawsuit, filed in August 1992, the Jacksons also alleged that a number of Swift Eckrich's turkey-handling practices violated both the contracts and the PSA. For example, Swift Eckrich's weighmaster, Dean Bartlett, was not aware of, and did not comply with, certain federal regulations that governed the timing of turkey-weighing, even though he had earlier signed an affidavit agreeing to comply with such regulations. Swift Eckrich also failed to properly record truck identification numbers when the turkeys were weighed. Such information was important because the turkeys were weighed in the trucks; therefore, in order to obtain an accurate weight for the turkeys, the proper truck weight, the "tare" weight, had to be

deducted from the gross weight. The Jacksons presented expert testimony at trial that the weighing system employed by Swift Eckrich resulted in underweighed turkeys. The Jacksons also contended that Swift Eckrich improperly charged an excessive number of dead-on-arrival birds (DOAs) to them, even though Swift Eckrich's "catch-and-haul" crews, employees who retrieved and transported the turkeys, may have caused some of the fatalities by mishandling the turkeys. Moreover, instead of using a contract formula for deducting condemned turkey carcasses, Swift Eckrich used an average-live-weight calculation. Swift Eckrich later admitted that condemned turkeys (rejects) were typically smaller than average. Although a typical Swift Eckrich turkey weighs about 26 pounds, Swift Eckrich admitted that some weight tickets showed condemned turkeys weighing over 80 pounds. Finally, the Jacksons alleged that Swift Eckrich improperly charged them for bird downgrades. The grading of turkey quality affected the price Swift Eckrich paid the growers. The Jacksons maintained that many of the bruised birds which were downgraded by Swift Eckrich received injuries as a result of the way Swift Eckrich catch-and-haul crews handled the birds.

The Jacksons brought this action under a variety of legal theories, some overlapping, which included alleged violations of the PSA, breach of contract, fraud, breach of the implied warranty of merchantability, and negligence. The negligence claim was not submitted to the jury. The jury found that Swift Eckrich violated the PSA, breached its contracts with the Jacksons, and committed common law fraud. The jury found in favor of Swift Eckrich on the breach of the implied warranty of merchantability, a claim which was premised on the Jacksons' allegation that Swift Eckrich sold them bad poults. The jury awarded the Jacksons $251,000 for Swift Eckrich's failure to offer performance contracts to the Jacksons for 1989, 1990, and 1991. It also awarded $50,000 to the Jacksons for "other violations" of the PSA, and $40,000 for breach of contract and fraud.

Following the verdict, Swift Eckrich filed a motion for judgment as a matter of law,

maintaining that the doctrine of primary jurisdiction should have precluded the issues regarding the alleged PSA violations from reaching the jury. The district court granted the motion in part, holding that the allegation of a PSA violation based upon Swift Eckrich's practice of offering different contracts to various growers was more appropriately addressed by the administrative agency, i.e. the Packers and Stockyards Administration (a division of the Department of Agriculture), charged with oversight of the PSA. *See* 836 F.Supp. at 1450–56. As a result, an amended judgment was issued, reducing the damages award by $251,000. The district court left intact that portion of the award based on "other" PSA violations, holding that the expertise of the Secretary of Agriculture was not necessary to determine whether such acts or practices violated the PSA. *Id.* at 1457. The district court also held that, if it were wrong on the primary jurisdiction question, it would nonetheless grant judgment as a matter of law to Swift–Eckrich with regard to its failure to offer performance contracts because, as a matter of law, the failure to offer performance contracts did not violate the PSA. *Id.* at 1456. The Jacksons filed a notice of appeal from the partial grant of judgment as a matter of law on November 23, 1993, and on December 7, 1993, Swift Eckrich cross-appealed from the district court's denial of the rest of its motion for judgment as a matter of law. At the request of this court, the United States filed a brief, as amicus curiae, on the issue of primary jurisdiction.

## II. DISCUSSION

### A.

■ Primary jurisdiction is a "judicially created doctrine whereby a court of competent jurisdiction may dismiss or stay an action pending a resolution of some portion of the action by an administrative agency." *Wagner & Brown v. ANR Pipeline Co.,* 837 F.2d 199, 201 (5th Cir.1988). It is a doctrine "specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency." *Reiter v. Cooper,* —— U.S. ——, ——, 113 S.Ct. 1213, 1220, 122 L.Ed.2d

604 (1993). This doctrine is often confused with the doctrine of exhaustion of administrative remedies. The exhaustion doctrine ordinarily requires a plaintiff to pursue relief, when available, from an administrative agency before proceeding to the courts. Until that recourse is exhausted, suit is premature and must be dismissed. *Id.* The doctrine of primary jurisdiction requires a court to enable a referral to an agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling. *Id.*

■ The Jacksons contend that, more than twenty-five years ago, this court held that the Secretary of Agriculture had no administrative power under the PSA to prevent discrimination or unfair practices by live poultry dealers. *See Arkansas Valley Industries v. Freeman,* 415 F.2d 713, 718 (8th Cir.1969) (*Freeman* ). They argue that this situation remains unchanged today. Although they concede that the Secretary has rule-making and supervisory authority, they contend that the sole means of enforcement under the circumstances of this case is by a suit filed in federal district court by either the Secretary of Agriculture through the Department of Justice or an aggrieved party. The United States, as amicus, agrees that Congress has not authorized the Secretary to conduct administrative proceedings to adjudicate allegations of unfair practices committed by poultry dealers. Swift Eckrich, on the other hand, argues that the district court correctly concluded that whether its failure to offer performance contracts to the Jacksons constituted unjust discrimination under § 202 of the PSA, 7 U.S.C. § 192, was a question within the special expertise of the Secretary. The district court held that "this issue should first be determined by the Secretary of Agriculture in appropriate proceedings mandated by the Packers and Stockyards Act." 836 F.Supp. at 1454. The district court rejected the argument that the PSA administrative enforcement provisions were limited to livestock dealers, concluding that the Poultry Producers Financial Protection Act of 1987, Pub.L. No. 100–173, 101 Stat. 917 (1987), which amended the PSA, brought live poultry dealers such as Swift Eckrich within the scope of the PSA adminis-

trative review procedures. The Jacksons and the United States maintain that the 1987 amendments did not provide the poultry growers with access to such review.

Whether the Secretary of Agriculture has primary jurisdiction under the PSA to determine whether a live poultry dealer engaged in discriminatory or unfair practices requires a careful examination of the statutory scheme of the PSA. As a point of departure, we note the PSA's definition of "poultry" includes turkeys, but its definition of "livestock" does not. *See* 7 U.S.C. § 182(4), (6). This simple distinction is important to a proper understanding of the scope of the Secretary's administrative review under the PSA. Section 202 of the PSA sets out the prohibited conduct at issue in the present case:

> It shall be unlawful for any packer with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to:
>
> (a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or
>
> (b) Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

7 U.S.C. § 192(a), (b). It is undisputed that Swift Eckrich is a "live poultry dealer" as that term is defined by the PSA. *See* 7 U.S.C. § 182(10). Section 308(a) of the PSA, as amended, provides that any person subject to the statute who violates any of its provisions relating to the purchase or sale of poultry or relating to any poultry growing arrangement shall be liable to the persons injured for the full amount of damages sustained in consequence of such violation. *See* 7 U.S.C. § 209(a). Section 308(b) further states that such liability may be enforced either by complaint to the Secretary "*as provided by section [309]*" or by suit in any district court of the United States of compe-

tent jurisdiction. 7 U.S.C. § 209(b) (emphasis added).

Interpretation of § 309 of the PSA, 7 U.S.C. § 210, thus becomes important to the controversy in the present case. Section 309(a) provides an administrative procedure through which an aggrieved party may seek relief for a PSA violation by any "stockyard owner," "market agency," or "dealer." Each of these terms is defined in the statute. The definition of a "stockyard" includes the presence of livestock; accordingly, the term "stockyard owner" cannot be applied to Swift Eckrich or the Jacksons. *See* 7 U.S.C. §§ 201, 202. The terms "market agency" and "dealer" also refer only to situations involving livestock. *See* 7 U.S.C. § 201.

The only other statutory provision governing the procedures for adjudicating alleged violations of the PSA, § 203, 7 U.S.C. § 193, refers to the Secretary's authority over those violations committed by a "packer." A "packer" is defined as a person engaged in the livestock business. 7 U.S.C. § 191. This court previously concluded that the PSA's definition of "packer" does not include live poultry dealers. *Freeman*, 415 F.2d at 718. After considering the statutory language and the legislative history, the *Freeman* court held the Secretary did not have the authority under § 203 of the PSA to issue and enforce a cease and desist order against live poultry dealers and handlers. *Id.*

In the present case, we hold the district court mistakenly construed "dealer" in § 309 of the PSA to include live poultry dealers and thereby concluded the Jacksons could have brought their complaint for damages against Swift Eckrich in an administrative proceeding. The district court overlooked the fact that the terms "dealer" and "live poultry dealer" are expressly defined by the PSA to be mutually exclusive. Under the plain language of the PSA, the administrative complaint procedure under § 309 of the PSA is simply not available for claims against a live poultry dealer.[3] The current statutory

scheme provides no procedure through which the Jacksons could obtain an administrative ruling that Swift Eckrich's failure to offer performance contracts did or did not violate § 202 of the PSA.

Swift–Eckrich argues the district court correctly applied the doctrine of primary jurisdiction because the 1987 amendments to the PSA provide aggrieved poultry growers, like the Jacksons, with a procedure for administrative review. The 1987 amendments, however, only authorized the Secretary to enforce administratively the trust and prompt payment provisions of the PSA against live poultry dealers. *See* 7 U.S.C. §§ 197, 228(b)(1), (2). The trust provision protects poultry growers in the event of a buyer bankruptcy and the prompt payment provision regulates the time for payment of producers. Neither of these provisions was at issue in this case.

The 1987 amendments did expand the scope of § 308 of the PSA by allowing claims for damages based on poultry-related violations of the PSA. *See* 7. U.S.C. § 209(a). However, the administrative enforcement provisions contained in § 309 of the PSA were not changed; therefore, as explained above, liability and damages for violations of the PSA by poultry dealers can be determined only through suit in federal court, not an administrative proceeding. The district court mistakenly concluded that the expansion of § 308 of the PSA to allow aggrieved parties in the poultry industry to recover damages for PSA violations implied that the administrative authority contained in § 309 of the PSA should also be expanded.

Swift Eckrich argues it is "completely illogical for Congress to have created administrative authority of the Packers and Stockyards Administration over live poultry dealers and give it no method to enforce such authority." Brief for Appellee/Cross–Appellant at 16. However, §§ 308 and 309 of the PSA do provide a forum for persons ag-

---

3. The district court's reliance on *McCleneghan v. Union Stockyards Co.*, 298 F.2d 659 (8th Cir. 1962) (*McCleneghan*) was similarly misplaced. That case held that primary jurisdiction existed in the Department of Agriculture under § 309 of the PSA. However, *McCleneghan* concerned vio-

lations by stockyard owners and livestock dealers, who, unlike live poultry dealers, are covered by the express terms of § 309 of the PSA. Because § 309 of the PSA does not include live poultry dealers within its provisions, *McCleneghan* does not control here.

grieved by a PSA violation in connection with the purchase or sale of poultry, or relating to any poultry growing arrangement. That forum is the federal district court. Whether this legislative decision was logical is not for us to decide. The plain language of the PSA reflects Congress's decision to make certain administrative procedures available only to those involved in the red meat industry. The fact that this choice may have been unwise or even inadvertent will not allow us to imply an administrative avenue of redress where the PSA clearly does not provide one. Because the plain language of the PSA provides for an aggrieved party, or the Secretary, to seek redress in federal district court and because no administrative referral of the question of what constitutes a discriminatory or unfair practice in the poultry industry under the current statutory scheme is feasible, we hold that the district court erred in applying the doctrine of primary jurisdiction to the Jacksons' PSA claims.

## B.

The Jacksons alleged that a representative of Swift Eckrich initially told them they would be able to choose a floor or performance contract during their relationship with Swift Eckrich. They also argue Swift Eckrich offered growers the choice between performance and floor contracts during the same years that they were denied such a choice. They contend that such denials were violations of § 202 of the PSA, 7 U.S.C. § 192, which prohibits, among other things, unfair, unjustly discriminatory, or deceptive practices. Swift Eckrich responds that the Jacksons were denied performance contracts because of their inability to control costs. Further, Swift Eckrich contends that the only growers without feed mills who were offered performance contracts were those who subcontracted with a producer who had a mill. The district court concluded, as a matter of law, that "the claimed actions [with] respect to the performance contracts were neither deceptive or injurious to compe-

tition, nor were they unfair, unjust, or unreasonable." 836 F.Supp. at 1456. We agree.

As the district court recognized, the Jacksons were under no obligation beyond any of the one-year contracts to do business with Swift Eckrich. Likewise, Swift Eckrich was under no obligation to continue to do business with the Jacksons. When the Jacksons first asked for a performance contract, after performing under three consecutive one-year floor contracts, Swift Eckrich could have refused to offer any contract whatsoever to the Jacksons. The Jacksons have not argued that some type of estoppel or option contract was at work here. Thus, their claim, in essence, is that § 202 of the PSA, 7 U.S.C. § 192, statutorily creates an entitlement to obtain the same type of contract that Swift Eckrich may have offered to other independent growers. We are convinced that the purpose behind § 202 of the PSA, 7 U.S.C. § 192, was not to so upset the traditional principles of freedom of contract. The PSA was designed to promote efficiency, not frustrate it. See Farrow v. United States Dep't of Agriculture, 760 F.2d 211, 214 (8th Cir.1985); see also De Jong Packing Co. v. United States Dep't. of Agriculture, 618 F.2d 1329, 1335 n. 7 (8th Cir.) ("While § 202 of the Packers and Stockyards Act may have been made broader than antecedent antitrust legislation in order to achieve its remedial purpose, it nonetheless incorporates the basic antitrust blueprint of the Sherman Act and other pre-existing antitrust legislation. . . ."), cert. denied, 449 U.S. 1061, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980). Therefore, affirming the district court's alternative grounds, we hold the district court did not err in granting judgment as a matter of law to Swift Eckrich on the performance contract issue.[4]

With regard to the claims of "other" PSA violations, the breach of contract claim, and the fraud claim, the district court found that a jury question existed. 836 F.Supp. at 1457. We agree. The Jacksons presented evidence that Swift Eckrich had violated a

---

4. Because we hold that Swift Eckrich's failure to offer performance contracts to the Jacksons did not violate the PSA, we need not reach the question whether the four-year statute of limitations the district court applied to the PSA barred re-

covery for Swift Eckrich's failure to offer a performance contract for the 1989 growing year because the 1989 floor contract was signed by the Jacksons four years and one day before they filed this lawsuit.

number of PSA regulations, that it did not use the condemned carcass calculation formula provided in the floor contracts, and that it recorded bird weights without actually performing any measurements. The evidence was sufficient for reasonable minds to differ as to these claims. Therefore, we hold the district court was correct to deny Swift Eckrich's motion for judgment as a matter of law with regard to these claims.

## C.

■ The Jacksons argue that the district court erred in calculating its reduction of the damages award. The district court crafted a three-part interrogatory on damages because of its concern about the viability of the performance contract issue. Interrogatory No. 5 read as follows:

(a) State the amount of damages, if any, you find were sustained by the plaintiffs as a result of the violations of the Packers & Stockyards Act in connection with the plaintiffs' contention that defendants failed to offer plaintiffs performance contracts in the following years [1989–1991].

(b) State the amount of any damages you find were sustained by the plaintiff as a result of any other violations of the Packers & Stockyards Act.

(c) State the amount of damages, if any, you find were sustained by the plaintiffs on the breach of contract claims and fraud claims.

Trial Transcript, Vol. IV, at 903–04. The Jacksons contend that the jury award of over $250,000 under subparagraph (a) included damages based on the various improper weighing and handling practices as well as damages for the failure of Swift Eckrich to offer a performance contract to the Jacksons for 1989–1991. Based on their interpretation of the jury's verdict, the Jacksons conclude that the $50,000 award under subparagraph (b) for other violations was for conduct in the years 1987 and 1988. Thus, they contend that the district court excessively reduced the award by eliminating damages for PSA violations in the years 1989–1991 that were not based on the failure to offer a performance contract. They argue that, if the jury had been told that the failure to offer a

performance contract was not a PSA violation, the jury's award under subparagraph (b) would have included damages which the jury simply incorporated into subparagraph (a). The Jacksons based this argument in part on the fact that the jury's award under subparagraph (a) closely paralleled their expert's damage calculations for 1989–1991. These calculations included amounts for the alleged mishandling practices. Swift Eckrich responds that the Jacksons improperly ask this court to speculate as to what the jury would have done under different circumstances. It argues that Interrogatory No. 5 did not limit the jury's ability to assess damages based on the floor contracts for 1989–1991 and that the district court, by separating the damages, clearly addressed the Jacksons' concerns.

The Jacksons' counsel brought these concerns to the attention of the district court in a bench conference immediately before the district court gave the jury the damages interrogatory. Trial Transcript, Vol IV, at 904–06. After the conclusion of the bench conference, the district court attempted to further explain the interrogatory to the jury:

Interrogatory Number 5 has three subparts. The last subpart has to do with the amount of damages sustained by the plaintiff on their breach of contract and fraud claims.... The other two have to do with damages in respect to the Packers & Stockyards violations.

It is possible that you all could believe that the Packers & Stockyards Act has been violated in more than one way. We have separated damages for various reasons.

And those damages are, in subparagraph A, those that you believe were suffered, if any—and it says if any—as a result of not getting a performance contract, if you believe that was a violation of the Packers & Stockyards Act.

Subpart B is any other damages, such as weighing, shrink, whatever, any other damages you find as a result of the violation of the Packers & Stockyards Act. Make sure that you take that into account. In other words, in B don't put anything in

there having to do with the performance contract. Put that in A if you believe that the performance contract—the failure to give a performance contract—was a violation of the Packers & Stockyards Act.

Trial Transcript, Vol. IV, 906–07. This instruction clearly provided that damages for improper handling practices such as untimely and improper weighing were to be awarded in subparagraph (b). Therefore, the jury was not limited in assessing damages under the floor contracts. Moreover, it would be pure speculation for this court to attempt to determine the jury's understanding of the expert testimony in this case in order to recalculate the damage award. We think the district court's instruction and explanation were adequate. Therefore, we hold the district court did not err in amending the judgment to reflect its determination that Swift Eckrich was entitled to a judgment as a matter of law on the performance contract issue.

### D.

■ The PSA does not provide a statute of limitations. The district court, therefore, applied the four-year statute of limitations period of the Sherman Act, 15 U.S.C. § 15(b), to the claimed PSA violations. Swift Eckrich argues that the district court should have applied the two-year limitations period of the Agricultural Fair Practices Act (AFPA), 7 U.S.C. § 2305(c). The AFPA was enacted by Congress to protect the rights of farmers and other producers of agricultural commodities to join cooperative associations. *See Michigan Canners & Freezers Ass'n. v. Agricultural Marketing & Bargaining Bd.*, 467 U.S. 461, 464, 104 S.Ct. 2518, 2520, 81 L.Ed.2d 399 (1984). The focus of the AFPA is thus rather narrow. Because the PSA has its origins in antecedent antitrust legislation and primarily prevents conduct which injures competition, we hold the district court did not err in applying the Sherman Act's statute of limitations to the PSA claims in the present case.

### III. CONCLUSION

Both parties have raised a number of other issues on the appeal and cross-appeal, all of which are without merit.[5]

For the reasons discussed above, the judgment of the district court is affirmed.

---

5. Swift Eckrich's motion to strike portions of the    record and the Jacksons' brief is granted.