[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 1, 2005
THOMAS K. KAHN
CLERK

No. 04-10040

D. C. Docket No. 01-00202-CV-WCO-2

HAROLD BRUCE LONDON,
CHRISTINE SAUNDERS LONDON,

                                        Plaintiffs-Appellants,

versus

FIELDALE FARMS CORPORATION,

                                        Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Georgia

(June 1, 2005)

Before ANDERSON, DUBINA and BLACK, Circuit Judges.

DUBINA, Circuit Judge:

Appellants, Harold Bruce London and Christine London, appeal the district court's order granting summary judgment to appellee/defendant, Fieldale Farms Corporation, on the Londons' Packers and Stockyards Act, 7 U.S.C. § 181 *et seq.*, ("PSA") retaliation and improper weighing claims. The Londons also appeal the district court's order granting Fieldale's motion for judgment as a matter of law on the Londons' PSA termination claim and state law breach of contract and fraud claims. For the reasons that follow, we affirm the district court's orders.

**BACKGROUND**

A. *Facts*

Fieldale is an integrated poultry company which enters into poultry growing contracts with growers. Fieldale owns various poultry feed mills, hatcheries, and processing plants. Fieldale's processing operations emanate from a business paradigm known as "contract farming."

Harold London worked as a broiler[1] flock supervisor and broiler manager for three different companies from 1979 until 1995. Christine London managed hen houses in the 1970's and worked as a chicken vaccinator for a poultry company in the 1980's. In 1987, the Londons purchased a nine acre farm that contained one chicken house for growing broilers ("Green Meadows No. 1"). In addition to this one broiler house on their residence, the Londons leased two other

_____

[1] A broiler is a baby chick.

farms, the J.W. Peck Farm, which had one poultry house, and the Merritt Martin Farm (later known as "Green Meadows No. 2"), which had two chicken houses. At the time the Londons purchased their farm, Mar-Jac Poultry Company employed Harold and agreed to place broilers on the Londons' farm. In 1990, Fieldale offered Harold a job as a broiler serviceman. After Harold commenced his employment with Fieldale, the Londons switched their grower contracts from Mar-Jac to Fieldale. In 1995, Fieldale terminated Harold's employment.

The Londons and Fieldale entered into three contracts that governed their grower arrangement. The contracts are similar in content. Each contract is a separate agreement for the Londons' various farms: (1) contract for Green Meadows No. 1; (2) contract for Green Meadows No. 2; and (3) contract for the J.W. Peck Farm. The contracts are to run indefinitely or until thirty days after notice of termination by either party. The contracts also give Fieldale the option to terminate on only seven days notice when continuing the contractual relationship would have detrimental effects on Fieldale's business.

Pursuant to its contracts with the Londons, Fieldale provides them with broilers, as well as the feed and medication necessary for successful growth. In return, the Londons are responsible for providing care and oversight for the broilers during the full term of the growth cycle, which normally lasts for forty to

forty-nine days.  The Londons' responsibility is vital to the success of the business and encompasses a variety of duties, such as maintaining adequate water and temperature for the baby chicks and "culling" out birds that are behind in growth. At the end of the grow-out period, Fieldale crates the broilers and ships them to its processing plants.  After Fieldale delivers the broilers to the processing plants, Fieldale weighs the birds, crates, and trucks on scales specifically designed to determine the birds' live weight.

Fieldale pays its broiler growers based upon a complex formula, primarily taking into account the weight of the birds upon their arrival at the plant and the feed consumed by the birds during the grow-out period.  Fieldale compares its growers based upon the cost of producing the finished broilers.  This comparison determines the relative performance of the grower.  Fieldale determines the average cost per pound for all of the birds processed during a one week period. Fieldale then determines the cost per pound for each grower whose birds were processed during that week.  Fieldale deducts money from the grower's check if his cost is above average, and adds money back to the grower's check if the cost of producing the broilers is below average.  In other words, Fieldale gives those growers who are most cost efficient a higher per-pound rate than those growers who cost Fieldale more money in food and medicine.

4

As part of its contractual duty to provide technical service, Fieldale assigns flock supervisors to visit the grower farms on a weekly basis to assist the growers with the management of the broilers. Fieldale's flock supervisors are required to maintain service reports on each grower farm. Fieldale also requires the flock supervisors to document any problems they find on the grower farms that endanger the broilers' welfare.

In 1997, Harold gave a deposition in a lawsuit against Fieldale. In that case, an African-American prospective chicken grower alleged that Fieldale denied him a contract to grow chickens because of his race. Fieldale had never contracted with an African-American grower. In his deposition, Harold testified that his supervisor, Doug Hatley, made racially derogatory comments. After Harold's testimony, the Londons allege that they began to notice that their flock supervisor was increasingly critical of their farm management. The Londons contend that in the spring of 1998, the flock supervisor checked on the Green Meadows No. 2 Farm and informed Christine that if they were not above average on the present flock then "they"[2] would terminate the grower contract. When the flock came in below average, Fieldale stopped delivering broilers to the farm. Later, another flock supervisor told the Londons that the remaining two farms would only get

---

[2] Christine testified that she understood the word "they" to mean Fieldale. [R. Vol. 7 p. 263].

one more bunch of birds. The Londons assert that the last flocks Fieldale delivered were infected with a disease known as gumboro.[3]

B. *Procedural History*

On November 20, 2001, the Londons filed suit against Fieldale asserting claims under the PSA for wrongful termination of their poultry growing contracts, alleging that the termination was without economic justification and in retaliation for Harold London's testimony in a racial discrimination lawsuit against Fieldale. The Londons asserted a PSA misweighing claim, alleging that Fieldale failed to transport promptly the Londons' birds after loading and failed immediately to weigh the birds upon arrival at the processing plant. The Londons also asserted state law claims for breach of contract and fraud. After discovery, Fieldale filed a motion for summary judgment. The district court granted the motion for summary judgment on the Londons' contention that Fieldale provided them with substandard chicks in retaliation for Harold's testimony in the race discrimination lawsuit; on the Londons' claim that Fieldale improperly failed to make fuel weight adjustments on the flocks from the Green Meadows Farms; on two other vague weighing claims; on the Londons' retaliation claim; and on the Londons' prompt

---

[3] Gumboro, or infectious bursal disease, is a viral disease that attacks young broiler chickens, usually between 18 and 26 days of age. The disease attacks the immune system, particularly the B cells, which produce antibodies. [R. Vol. 6 p. 179-81].

weighing and transportation claim. The case proceeded to trial with the following issues presented to the jury: (1) whether Fieldale violated the PSA in terminating the Londons' poultry growing contracts without economic justification; (2) whether Fieldale violated the PSA by failing to make a fuel weight adjustment on the flocks from the J.W. Peck Farm; (3) whether Fieldale violated the PSA by failing to make a wet bird adjustment to the weight of the flocks; and (4) whether Fieldale breached its contract with the Londons or defrauded the Londons by sending them settlement documents containing inaccurate weights.

After the Londons presented their case, Fieldale moved for a judgment as a matter of law on all claims. The district court granted the motion on the Londons' state law claims, on any PSA wet bird claim that arose prior to November 20, 1997, and on each PSA fuel adjustment claim except for those related to the J.W. Peck Farm. The district court reserved ruling on the termination claim. At the close of the evidence, Fieldale renewed its motion for judgment as a matter of law as to the post-November 20, 1997, wet birds claims, the J.W. Peck Farm fuel adjustment claim, and the PSA termination claim. The district court denied the motion, again reserving consideration of the motion as to the PSA termination claim. The jury returned a verdict in favor of the Londons on their termination claim and awarded them $164,000.00. The jury also returned a verdict for the

Londons on the wet bird claim, awarding them $225.00, and on the fuel adjustment claim, awarding them $32.00. After trial, Fieldale filed a renewed motion for judgment as a matter of law and, in the alternative, a motion for a new trial. The district court entered an order granting Fieldale's motion for judgment as a matter of law on the Londons' termination claim, setting aside $164,000.00 of the judgment. The Londons timely appealed.

## ISSUES

1. Whether the district court properly granted Fieldale's motion for judgment as a matter of law on the Londons' PSA termination claim because the Londons did not show that the termination had an adverse effect on competition.

2. Whether the district court properly granted Fieldale's motion for judgment as a matter of law on the Londons' state law claims for breach of contract and fraud.

3. Whether the district court properly granted Fieldale's motion for summary judgment on the Londons' PSA retaliation claim.

4. Whether the district court properly granted Fieldale's motion for summary judgment on the Londons' PSA improper weighing claims.

## STANDARDS OF REVIEW

8

This court reviews *de novo* the district court's order granting a party's motion for judgment as a matter of law. *Rossbach v. City of Miami*, 371 F.3d 1354, 1356 (11th Cir. 2004). "A judgment as a matter of law is warranted only '[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *U.S.S.E.C. v. Ginsburg*, 362 F.3d 1292, 1297 (11th Cir. 2004) (quoting Fed. R. Civ. P. 50(a)(1)). This court also reviews *de novo* the district court's order granting summary judgment, applying the same legal standards that governed the district court's decision. *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).

## DISCUSSION

A. *Statutory Provision*

At issue in this case is Section 202 of the PSA which provides that:

It shall be unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to:

(a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or

(b) Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subject any particular person or locality to any

9

undue or unreasonable prejudice or disadvantage in any respect; or

(c) Sell or otherwise transfer to or for any other packer, swine contractor, or any live poultry dealer, or buy or otherwise receive from or for any other packer, swine contractor, or any live poultry dealer, any article for the purpose or with the effect of apportioning the supply between any such persons, if such apportionment has the tendency or effect of restraining commerce or of creating a monopoly; or

(d) Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or

(e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or

(f) Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, or (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; or

(g) Conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a), (b), (c), (d), or (e) of this section.

7 U.S.C. § 192 (2004).

The PSA was enacted in 1921 "to comprehensively regulate packers, stockyards, marketing agents and dealers." *Hays Livestock Comm'n Co. v. Maly Livestock Comm'n Co.*, 498 F.2d 925, 927 (10th Cir. 1974). At the time Congress enacted the PSA, "[t]he chief evil feared [was] the monopoly of the packers, enabling them unduly and arbitrarily to lower prices to the shipper, who sells, and unduly and arbitrarily to increase the price to the consumer, who buys." *Stafford v. Wallace*, 258 U.S. 495, 514-15, 42 S. Ct. 397, 401 (1922). "Section 202 of the original Act made it unlawful for any 'packer' to engage in any anticompetitive, monopolistic, discriminatory, or deceptive practices." *United States v. Perdue Farms, Inc.*, 680 F.2d 277, 281 (2nd Cir. 1982). In 1935, Congress amended the PSA to include "live poultry dealers and handlers," *see id.* at 280-82, and later included swine contractors. The PSA authorizes the Secretary of Agriculture to enjoin violations of Section 202(a) by packers and swine contractors. *See* 7 U.S.C. § 193. The PSA does not, however, authorize the Secretary to enjoin violations by live poultry dealers.[4] *See id.* Persons injured as a result of a violation by a live poultry dealer may bring an action in federal district court to

___

[4] There is no question that Fieldale is a "poultry dealer" under the PSA. A "live poultry dealer" is "any person engaged in the business of obtaining live poultry by purchase or under a poultry growing arrangement for the purpose of either slaughtering it or selling it for slaughter by another." 7 U.S.C. § 182(10).

11

recover "the full amount of damages sustained in consequence of such violation." 7 U.S.C. § 209(a).

B. *Issues*

1. Section 202(a) requires an anti-competitive effect.

The Londons contend that the district court erred in granting Fieldale's motion for judgment as a matter of law on their PSA termination claim because Fieldale terminated their grower contracts without sufficient economic justification in violation of 7 U.S.C. § § 192(a) and (b). Section 192(a) prohibits packers from engaging in or using any "unfair, unjustly discriminatory, or deceptive practice or device." 7 U.S.C. § 192(a). Section 192(b) prohibits packers from subjecting "any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect." 7 U.S.C. § 192(b). The statute does not define what constitutes an "unfair, unjustly discriminatory, or deceptive practice." The Londons and *amicus* United States Department of Agriculture ("DOA") contend that the plain language of the statute, the purpose of the PSA, and the DOA's interpretation all indicate that in order to prove that any practice is "unfair" under § 202(a), it is not necessary to prove predatory intent, competitive injury, or likelihood of injury. Fieldale and *amicus* National Chicken Council counter that the district court properly determined that plaintiffs must show that the unfair,

12

discriminatory or deceptive practice adversely affected competition in order to prevail under the PSA. This is an issue of first impression for our circuit.

"As in all cases of statutory construction, our task is to interpret the words of the[] statute[] in light of the purposes Congress sought to serve." *Norfolk Redevelopment & Housing Auth. v. Chesapeake & Potomac Tel. Co.*, 464 U.S. 30, 36, 104 S. Ct. 304, 307 (1983) (quotation and citation omitted); *see also United States v. Gonzalez*, 671 F.2d 441, 443 (11th Cir. 1982) (noting that "this court's task is to construe the statute in light of the purposes Congress sought to serve"). Along those lines, courts have construed the PSA "against the backdrop of corruption the Act was intended to prevent." *Philson v. Cold Creek Farms*, 947 F. Supp. 197, 200 (E.D. N.C. 1996). The primary purpose of the PSA was "to assure fair competition and fair trade practices in livestock marketing and in the meatpacking industry." H.R. Rep. No. 85-1048 at p.1 (1958) *reprinted in* 1958 U.S.C.C.A.N. 5212, 5213. At the time of enactment, the chief evil Congress feared was the monopoly of the packers. *Stafford*, 258 U.S. at 514-15, 42 S. Ct. at 401. The Act "was aimed at halting 'a general course of action for the purpose of destroying competition.'" *Armour & Co. v. United States*, 402 F.2d 712, 720 (7th Cir. 1968) (quoting House Report No. 1297, 66th Cong. 3d Sess. (1921), p. 11).

Relying upon the PSA's antitrust ancestry, several courts have held that

13

only those unfair, discriminatory or deceptive practices adversely affecting competition are prohibited by the PSA. *See Farrow v. Dep't of Agric.*, 760 F.2d 211, 214 (8th Cir. 1985); *Pacific Trading Co. v. Wilson & Co.*, 547 F.2d 367, 369-70 (7th Cir. 1976); *Armour & Co.*, 402 F.2d at 722-23; *Griffin v. Smithfield Foods, Inc.*, 183 F. Supp. 2d 824, 827 (E.D. Va. 2002); *Cold Creek Farm*, 947 F. Supp. at 200; *see also Philson v. Goldsboro Milling Co.*, 164 F.3d 625, No. 96-2542, 96-2631, 1998 WL 709324, at *4 (4th Cir. Oct. 5, 1998) (finding that the district court did not err in instructing the jury that the plaintiffs were required to prove that the defendants' conduct was likely to adversely affect competition in order to prevail on their claims under the PSA and noting that the plaintiff must establish that the challenged act is *likely* to produce the type of injury that the Act was designed to prevent). *But see Spencer Livestock Comm'n Co. v. Dep't of Agric.*, 841 F.2d 1451, 1454-55 (9th Cir. 1988); *Wilson & Co. v. Benson*, 286 F.2d 891, 895-96 (7th Cir. 1961).[5] We join those circuits that hold that in order to succeed on a claim under the PSA, a plaintiff must show that the defendant's unfair,

---

[5] The Londons and the Government rely on *Wilson* for their contention that Section 202(a) does not require an adverse effect on competition. However, as the district court noted, *Wilson* did not abdicate the need for a competitive injury. The *Armour* court held that "the *Wilson* case does not support the . . . view that neither intent nor some kind of competitive injury is necessary for the operation of Section 202(a)." *Armour*, 402 F.2d at 718.

discriminatory or deceptive practice adversely affects or is likely to adversely affect competition.

The *Armour* decision is instructive on this issue. In *Armour*, the Seventh Circuit considered the legislative history of the PSA and noted its antitrust roots. The court inferred that the PSA might be broader than antecedent antitrust legislation, but found that "there [was] no showing that there was any intent to give the Secretary of Agriculture complete and unbridled discretion to regulate the operations of packers." 402 F.2d at 722. The court reasoned:

> Section 202(a) should be read liberally enough to take care of the types of anti-competitive practices properly deemed 'unfair' by the Federal Trade Commission (15 U.S.C. § 45) and also to reach any of the special mischiefs and injuries inherent in livestock and poultry traffic. However, in Section 202(a) Congress gave the Secretary no mandate to ignore the general outline of long-time antitrust policy by condemning practices which are neither deceptive nor injurious to competition nor intended to be so by the party charged.

*Id.*

Recognizing that Section 202(a) "authorize[s] the Secretary of Agriculture to regulate anticompetitive trade practices in the livestock and meat industry," the Eighth Circuit held that "[a] practice is 'unfair' . . . if it injures or is likely to injure competition." *Farrow*, 760 F.2d at 214. Similarly, the Ninth Circuit has held that, at the very least, Section 202(a) requires "a reasonable likelihood that . . . the

15

result [of a practice] will be an undue restraint of competition." *De Jong Packing Co. v. United States Dep't of Agric.*, 618 F.2d 1329, 1337 (9th Cir. 1980). The Fourth Circuit likewise has held that a Section 202(a) plaintiff must establish at least "the likelihood that an arrangement will result in competitive injury." *Philson v. Goldsboro Milling Co.*, 1998 WL 709324, at *4 (quotation omitted).

Policy considerations also weigh in our decision-making. We note that elimination of a competitive impact requirement would subvert the policy justifications for the PSA's adoption. As the *Armour* court noted, the main Congressional motivation for the PSA's passage was the need for "specialized regulation of the many-tiered packing industry, with its unique problems." *Armour*, 402 F.2d at 721. Thus, Congress selected the Secretary as overseer, but established some restrictions with regard to the Secretary's authority. "Congress gave the Secretary no mandate to ignore the general outline of long-time antitrust policy by condemning practices which are neither deceptive nor injurious to competition nor intended to be so by the party charged." *Id.* at 722. Eliminating the competitive impact requirement would ignore the long-time antitrust policies which formed the backbone of the PSA's creation. Failure to require a competitive impact showing would subject dealers to liability under the PSA for

16

simple breach of contract or for justifiably terminating a contract with a grower who has failed to perform as promised.

Moreover, we do not give *Chevron*[6] deference to the Secretary's interpretation of Section 202(a). This court gives *Chevron* deference to agency interpretations of regulations promulgated pursuant to congressional authority. *NLRB v. United Food and Commercial Workers Union*, 484 U.S. 112, 123, 108 S. Ct. 413, 421 (1987). The PSA does not delegate authority to the Secretary to adjudicate alleged violations of Section 202 by live poultry dealers. *See* 7 U.S.C. § 193(a). Congress left that task exclusively to the federal courts. *See Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1456-57 (8th Cir. 1995). The absence of such delegation compels courts to afford no *Chevron* deference to the Secretary's construction of Section 202(a). *See, e.g., United States v. Mead Corp.*, 533 U.S. 218, 226-27, 121 S. Ct. 2164, 2171 (2001) (stating that "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority"). Because Congress plainly intended to prohibit "only those unfair, discriminatory or deceptive

---

[6] *Chevron U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778 (1984).

practices adversely affecting competition," *see Philson*, 947 F. Supp. at 200, a

contrary interpretation of Section 202(a) deserves no deference. *See*

*Heimmermann v. First Union Mortgage Corp.*, 305 F.3d 1257, 1261 (11th Cir.

2002) ("No deference is to be given to an agency interpretation that is at odds with

the plain meaning of the statute being interpreted."), *cert. denied*, 539 U.S. 970,

123 S. Ct. 2641 (2003).[7]

In conclusion, we hold that in order to prevail under the PSA, a plaintiff

must show that the defendant's deceptive or unfair practice adversely affects

competition or is likely to adversely affect competition.[8] Therefore, the district

court properly granted Fieldale's motion for judgment as a matter of law on the

Londons' PSA termination claim because the Londons did not present any

---

[7] We note that the Government contends that the Secretary "has consistently interpreted the [PSA] to prohibit all unfair practices, regardless of whether those practices cause a competitive injury." Gov't. Brief p. 10. In support of this "consistent view," the Government relies on one agency decision: *In re Ozark County Cattle Co.*, 49 Agric. Dec. 336 (1990). We do not consider one agency decision to establish a "consistent view;" rather, this one agency decision only supports the Government's litigating position.

[8] We decline to adopt a disjunctive test for proving Section 202(a) violations: anticompetitive injury or predatory intent. We decline such a test because the Londons failed to preserve the question of predatory intent for appellate review. They did not argue in the district court that their case was a special circumstances case from which predatory intent could be inferred. Because the question of predatory intent was not preserved for appeal, we deem it to be abandoned. *See Rogero v. B.M. Noone*, 704 F.2d 518, 520 n.1 (11th Cir. 1983). However, assuming *arguendo* that we did adopt a disjunctive test for proving Section 202(a) violations, the Londons still would not prevail in this case. At trial, they did not present any evidence of Fieldale's alleged predatory intent in terminating the grower contracts.

18

evidence at trial that Fieldale's termination of their grower contracts adversely affected or was likely to adversely affect competition. The Londons did not present any evidence as to the total number of chicken growers or buyers in the north Georgia area. The Londons did not present any evidence regarding the percentage of the chicken market Fieldale controlled. Furthermore, the Londons did not present any evidence of their or Fieldale's relative stature within the chicken industry. Accordingly, we affirm the district court's order granting Fieldale's motion for judgment as a matter of law on the Londons' PSA termination claim.[9]

2. Judgment as a Matter of Law was proper on state law claims.

The Londons claimed that Fieldale breached the broiler contracts by providing poor quality and sick birds, failing to weigh the chickens accurately, and failing to provide sufficient medication and vaccinations for the flocks. The Londons did not support their claim with any reference to a specific contract

---

[9] The Londons based their claim on their contention that Fieldale wrongfully terminated their contract because Harold testified in a race discrimination case against Fieldale. From this, the Londons asserted that the jury could infer an anticompetitive effect; i.e., the growers would not complain about any adverse Fieldale business practice for fear that Fieldale would terminate their contracts. For the reasons stated in our opinion, the district court properly granted summary judgment on the Londons' retaliation claim. They did not present any evidence that Fieldale retaliated against them after Harold testified in the discrimination lawsuit. Because the Londons did not present any evidence to support their claim of retaliation, the jury could not infer that such a deceptive, unfair practice (termination of contracts in retaliation for Harold's testimony) had an anticompetitive effect.

19

provision that they allege Fieldale breached. At the close of the Londons' case, the district court granted Fieldale's motion for judgment as a matter of law on the breach of contract claim. The district court did not err in so ruling. The broiler contracts only obligated Fieldale to provide to the grower the "necessary feed, vaccines, medications, and boot wash supplies" for raising the birds to processing age. [Plaintiff's Ex. 36]. Contrary to the Londons' assertion, Fieldale did not have a specific contractual duty to vaccinate the birds for gumboro prior to delivery. In sum, as the district court found, the Londons did not present any evidence to support their breach of contract claim. [R. Vol. 8 p. 468].

The Londons alleged that Fieldale supplied them with settlement statements that Fieldale knew to be false, and they relied on those statements in accepting the sums Fieldale paid for the broilers. The Londons claimed they were damaged as a result of their reliance on these false settlement statements. At the close of the Londons' case, the district court granted Fieldale's motion for judgment as a matter of law on the Londons' fraud claim. The district court correctly found that there was no evidence of an affirmative act or injury to support the Londons' fraud claim. Furthermore, the Londons proffered no evidence from which a jury could calculate any alleged loss with reasonable certainty. *See Brooks v. Dime Saving Bank of New York*, 457 S.E. 2d 706, 708 (Ga. Ct. App. 1995) (stating that a

20

plaintiff must show that he has been damaged and he must "establish the amount of [his] damages by providing the factfinder with evidence from which it can calculate the amount of loss with reasonable certainty"). Accordingly, the district court properly granted Fieldale's motion for judgment as a matter of law on the Londons' state law breach of contract and fraud claims.

3. Summary Judgment was proper on PSA retaliation claim.

The Londons argue that the district court improperly granted Fieldale's motion for summary judgment on their PSA retaliation claim. The Londons contend that they presented sufficient evidence from which a jury could infer that because of Harold's adverse testimony in the racial discrimination case, Fieldale retaliated against the Londons by terminating their grower contracts. The Londons claim that they presented evidence that their flock performance was average prior to Harold's testimony; that after his testimony, their flock supervisors became increasingly critical on their service reports; that the Londons' chick quality declined and Fieldale delivered sick birds; and that the Londons were not Fieldale's worse performing growers when Fieldale terminated their contracts.

The district court did not err in granting summary judgment on the Londons' PSA retaliation claim. The Londons failed to provide any evidence of

21

causation: that Fieldale terminated their contracts *because of* Harold's testimony in the racial discrimination. First, the evidence shows that for the flocks where the ages of the supplying hens are available, all of the Londons' chicks came from hens between 26 and 66 weeks old, which is within industry age standards. Thus, the Londons had no evidence to support their assertion that Fieldale was purposefully supplying them with substandard chicks. Moreover, the Londons failed to show that they were singled out to receive poor chicks as a form of retaliation. *See Philson*, 947 F. Supp. at 201-02 (noting that providing low quality birds can violate the PSA when it is done for an illegal reason, but requiring some proof that the illegal reason was the motivation behind the decision to supply the substandard birds).

Second, the evidence shows that the Londons' production declined significantly in 1997 and 1998. Of their 35 flocks in that time period, only nine were above average. Thus, the Londons' below average flocks during that time frame support Fieldale's assertion that it terminated the contract with the Londons due to sub-standard performance. In sum, the Londons did not present any evidence showing a causal connection between the contract termination and Harold London's testimony. Hence, the district court did not err in granting Fieldale's motion for summary judgment on the Londons' PSA retaliation claim.

22

4. Summary Judgment was proper on PSA misweighing claims.

The Londons argue that the district court erred in granting summary judgment to Fieldale on their misweighing claims for the loss of fuel weight in transit of the birds from their Green Meadows No. 1 Farm and their Green Meadows No. 2 Farm. The two contracts that cover these farms both provided that the weighing procedure would not include any adjustment for vehicle fuel used during transportation. The Londons do not provide any case law to indicate that two contracting parties would violate the PSA by inserting a provision regarding whether fuel usage would be considered during the weighing process. Instead, they rely on a regulation promulgated by the Grain, Inspection, and Packers and Stockyards Administration, pursuant to the PSA, that requires that poultry growers be paid based on the actual weight of the live poultry. *See* 9 C.F.R. § 201.55.

Congress passed the PSA to protect farmers and growers, but Congress did not intend for the PSA to supplant the "traditional principles of freedom of contract." *Jackson*, 53 F.3d at 1458. The Londons presented no evidence that they did not enter into these contract voluntarily, and throughout most of their growing relationship with Fieldale, the Londons never complained about the weighing of the birds. Moreover, we find the Londons' reliance on the regulation

23

to be unavailing because that section notes that any adjustment to the actual weight shall be explained on any statements. Fieldale did just that: it inserted contractual provisions in their grower contracts informing the Londons that no fuel adjustment would be made at weigh-in. Accordingly, the district court properly granted summary judgment to Fieldale on the Londons' fuel adjustment claims on their grower contracts for the Green Meadows Farms.

## CONCLUSION

In deciding the question whether Section 202(a) of the PSA requires a showing of anti-competitive effect, we are guided by the PSA's antitrust ancestry, case law, and policy considerations in holding that in order to prevail under the PSA, a plaintiff must show that the defendant's "unfair, unjustly discriminatory, or deceptive practices" either had an adverse economic impact or were likely to produce an adverse economic impact. To hold otherwise would subvert the purpose of the PSA. Accordingly, we affirm the district court's order granting judgment as a matter of law on the Londons' PSA termination claim. We also affirm the district court's orders granting judgment as a matter of law to Fieldale on the Londons' state law claims, and granting summary judgment to Fieldale on the Londons' PSA retaliation and misweighing claims.

**AFFIRMED**.