[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 04-11570

_____

D. C. Docket No. 01-00130 CV-2-WLS-1

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 15, 2005
THOMAS K. KAHN
CLERK

TRAVIS MIMS,

Plaintiff-Counter-
Defendant-Appellant,

versus

CAGLE FOODS JV, LLC,
d.b.a. Cagle-Keystone Foods,

Defendant-Counter-
Claimant-Appellee.

.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(June 15, 2005)

Before ANDERSON and WILSON, Circuit Judges, and JORDAN*, District Judge.

_____

* Honorable Adalberto Jordan, United States Judge for the Southern District of Florida,
sitting by designation.

PER CURIAM:

In this case, chicken grower Travis Mims alleges that Cagle Foods JV ("Cagle"), a chicken processing company, violated the Packers & Stockyards Act ("PSA"), 7 U.S.C. § 181 et seq., the Agricultural Fair Practices Act, 7 U.S.C. § 2301 et. seq., and the Georgia Racketeer Influenced & Corrupt Organizations Act, O.C.G.A. § 16-14-4 (2004), in a variety of ways. Mims also alleges claims for breach of contract, fraud, fraud in the inducement, and promissory estoppel. The district court granted summary judgment to Cagle on all claims, holding that Mims produced insufficient evidence to create a genuine issue of material fact with respect to his claims. After oral argument and careful consideration, we agree that Mims has not produced sufficient evidence to create a genuine issue of material fact. Accordingly, we affirm.

## I. FACTS

Cagle provides growers with baby chicks (known as "broilers") along with the necessary feed and medication, and, in return, the growers provide care and oversight for the broilers during the chicks' "grow-out." At the end of the grow-out, Cagle takes the broilers to its processing plants, weighs the truck full of birds, deducts the weight of the crates and the truck, and determines the weight of the broilers. The grower is compensated by a formula that compares his cost per

pound against similarly situated growers during the relevant time period. In order for the settlement to be correct, the number of birds must be accurately stated, the feed must be accurately accounted for, and the weight of the finished birds must be true and accurate. "Feed conversion," how much feed it takes to produce the chicken, is the most important factor in the determination of the pay formula.

Mims worked as a grower for Cagle, raising chickens on his own farm from 1994 through 2001, and for another owner, James Tyson, from 1999 through 2001. In 1994, Mims entered into a contract with Cagle to build four chicken houses. The agreement enumerated Cagle's obligations, but contained no reference to the specific numbers of birds to be placed, the numbers of flocks per year, the types of birds, or income or expense figures. The contract contained the merger clause:

> This Agreement constitutes the entire agreement between the parties and includes all promises and representations, express or implied, made by the Company and the Producer and by either of them. Any prior oral or written representations not expressly set forth in this Agreement are hereby cancelled and are no longer of any force or effect. This Agreement may not be altered in any manner except by a written instrument signed by both parties.

Mims' houses were completed and he received his first flock in August 1994. In the summer of 1997, Mims' flock placements were cut from 25,000 per house to 22,500 per house because Cagle had decided to use larger birds. At the

same time that Cagle reduced its flock placement, it increased grower pay from 4.3 cents per pound to 4.5 cents per pound.

In 1998, Mims became active in the United Poultry Growers Association ("UPGA"). In May 1999, Cagle offered all growers an option to enter into a new contract at a higher payment rate in exchange for an agreement to arbitrate all disputes. Mims refused to sign the new contract, and opted to forego the raise and to continue his relationship with Cagle under the existing contract.

In 1999, Mims began managing a six house farm owned by James Tyson pursuant to an agreement between Mims and Tyson. Cagle concluded that Mims' performance was sub-par. Cagle began to provide copies of Service Reports to Tyson. Mims was aware the Service Reports were being forwarded, saw copies of all reports, had an opportunity to respond, but did not.

Mims decided to put his own farm on the market in the fall of 2000, but planned to continue working for Tyson. On October 16, 2000, Mims told a Cagle employee that he wanted to put his farm on the market, and that he did not want to continue to grow chickens. Mims subsequently changed his mind. When Mims' flock was picked up in November of 2000, he was told that he was not on the placement schedule to receive another flock, so he requested that his flock supervisor put him on the schedule. Cagle agreed to place another flock after

4

Mims made some repairs. Cagle placed Mims' next flock on January 15, 2001. After the flock placed on Mims' farm in January 2001, Cagle terminated Mims' contract. In late 2000 a Cagle employee told Tyson that Cagle would not put any more birds in his houses as long as Mims was the manager.[1] Tyson decided to get out of the business and sold his farm in Spring of 2001.

## II. DISCUSSION

### A. Packers and Stockyards Act Claims

Mims argues that the district court erred by granting Cagle's motion for summary judgment on his Packers & Stockyards Act Claims. Mims argues that after joining the UPGA and refusing to sign the arbitration contract, his performance declined. Mims argues that the decline in his performance can be attributed to Cagles' retaliation toward Mims for joining the UPGA and refusing to sign the arbitration contract. Mims argues that he produced evidence creating a genuine issue of material fact of each of the following: (1) Cagle provided him with sick and unhealthy birds in retaliation for joining the UPGA in 1998, and for refusing to sign an arbitration contract in 1999; (2) Cagle delayed feed deliveries in retaliation; (3) Cagle engaged in various dishonest weighing practices that

___

[1] Cagle disputes this, but for the purpose of summary judgment we take the facts in the light most favorable to the plaintiff.

5

damaged Mims during the entire course of its relationship with Mims; and (4) the arbitration contract that was offered by Cagle violated the PSA because it was unconscionable and constituted a "bait and switch."[2]

The Packers and Stockyards Act prohibits "unfair, unjustly discriminatory, or deceptive practices or devices with respect to live poultry." 7 U.S.C. § 192. We assume arguendo that Mims is entitled to a jury on his PSA claim if he could produce evidence sufficient to raise a genuine issue with respect to any of his factual allegations. However, we conclude that Mims has not produced sufficient evidence such that a rational juror could find in his favor on any of these factual allegations.

---

[2] Mims also argues that Cagle failed to move for summary judgment on all grounds that formed the basis for Mims' PSA claim, and therefore the district court inappropriately granted summary judgment on these claims. Specifically, Mims states that the following allegations that could support a PSA claim were not addressed by Cagle or the district court: (1) termination of Mims' contract without economic justification; (2) Cagle's ceasing to place flocks with Mims during late 2000 without cause; and (3) Cagle's making of false statements to Mims' employer Tyson and pressuring him to terminate his relationship with Mims. However, Cagle discussed each of these issues in the factual statement of its brief in support of summary judgment, and stated, "An analysis of the 'evidence' presented by plaintiff makes clear that he has not proven any of his laundry list of alleged discriminatory acts." Cagle's statement that Mims has not proven any of his laundry list of alleged discriminatory acts constitutes a motion for summary judgment on all grounds that could serve as the basis of his PSA claim. We conclude that the district court properly found that Mims lacked sufficient evidence to support his PSA claim. There is nothing to indicate that Cagle made false statements to Tyson. Cagle stopped placing flocks with Mims at Mims' request. Termination of a contract without economic justification is insufficient to sustain a claim under the PSA absent a showing of anticompetitive effect. See London v. Fieldale Farms Corp., __F.3d.__, 2005 WL 1279147 at *5 (11th Cir. June 1, 2005).

6

Mims claims that Cagle provided him with sick and unhealthy birds in retaliation for joining the UPGA in 1998, and for refusing to sign an arbitration contract in 1999. Mims makes the vague and conclusory statement that "it was made clear to [him]" that some people had lost farms for being a problem, but admits that he does not know of any farmers who lost their farm, and he does not cite any specific instances of coercion, harassment, or discrimination. Mims and some of his employees provided deposition testimony stating that Mims received a significant number of "bad looking birds"; however, both Mims and his employees testified that this occurred both before and after Mims joined the UPGA and refused to sign the arbitration contract.[3] Furthermore, Mims had not recorded any problem on his chick delivery reports. While Mims provided some weak evidence[4] suggesting that Cagle may have had some control over where particular flocks were placed, he produced no evidence suggesting that Cagle targeted him to receive poor flocks or even suggesting a likelihood of it. In short, Mims produced insufficient

---

[3] We also note that Mims' own expert produced a regression analysis that suggested, at best, Mims' membership in the UPGA could explain only 1% of Mims' decreasing performance.

[4] The strongest of this evidence was an affidavit from a former chick bus driver who worked for Cagle from 1996-97. The driver's affidavit merely stated that he recalled chick deliveries being changed from one farm to another and being told that certain houses were not ready and he needed to take the chicks to another farm. He also noted that most farms would receive chicks from one to three breeder flocks, but that one particular grower received chicks from a variety of different breeder flocks and often complained about the chick quality.

evidence suggesting that he received more bad birds than other growers because of retaliation.

Next, Mims alleges that Cagle delayed feed and chick deliveries, and terminated Mims' contract in retaliation for Mims' participation in the UPGA and for his refusal to sign a contract that included an arbitration clause. The only evidence Mims offers to support this claim is the affidavit of a former feed mill manager who stated that, at the request of his managers, he would create feed credit tickets so as to change weekly settlements, and that he believed that the managers were "manipulating the growout settlements to help certain growers and hurt other growers." The former feed mill manager also stated that managers would discuss the leaders of the growers' association during management meetings, and would have discussions about pressuring growers who would not sign a contract with the arbitration clause to sign the contract. However, nothing in his affidavit provides evidence of any retaliation against Mims, and as noted below, there is not other evidence which might create a jury question.

Mims, however, offers nothing more than his personal belief that his growout settlements were inaccurate. Mims did not document times that he ran out of feed, but merely states that it happened often. The one instance that Mims could recall running out of feed for a significant period of time happened due to a bomb

threat at the Cagle plant, and occurred in 1995, well before he joined the association or refused to sign the arbitration contract. Mims only testifies to one instance in which he was charged for feed he did not receive. The instance involved confusing circumstances, and Mims offers nothing to suggest that the charge was anything more than a reasonable mistake. Mims argues that Cagle delayed flock deliveries in retaliation, but the only delay he cites happened after Mims had indicated that he did not want a bird placement, subsequently changed his mind, and Cagle had advised him to make repairs to his farm before it would place another flock. We simply do not see how a reasonable juror could conclude that Mims was retaliated against on the basis of this evidence.

Mims states that his flock supervisors issued harsher reviews after Mims joined the association, but Mims does not point to any false statements on those reviews, but merely objecting to what he considered to be "nitpicking." Similarly, with respect to the termination of Mims' contract, there is little to indicate that Cagle terminated Mims' contract for any reason other than it perceived him to be a poor manager.

Third, Mims alleges that Cagle engaged in various dishonest weighing practices that damaged Mims during the entire course of its relationship with him. Mims states that he is "unable to point to specific instances of improper weighing

9

because it was Cagle's policy and practice to prevent growers from discovering its fraudulent weighing practices by requiring appointments to observe the weighing process." Cagle had a policy that "[a]ny grower wanting to see their birds weighed must have authorization from management to enter the property" for "proper security at our operation." Mims states that requiring appointments to view weighings violated federal regulation 9 C.F.R. § 201.108-1(e)(4) because it impeded the "unfettered observation" to which the growers were entitled. § 201.108-1(e)(4) states that growers are entitled to observe balancing, weighing, and recording procedures, and precludes weighers from denying growers that opportunity. Mims admitted that he could have scheduled an appointment to watch his birds being weighed, but that he never did so. Nothing in 9 C.F.R. §201-108-1(e)(4) suggests that requiring appointments for security purposes is precluded or even discouraged. As such, this does not constitute evidence that Cagle misweighed Mims' birds.

The only other evidence Mims presents with respect to misweighing relates to procedures at the plant before 1996.[5] In 1996, Cagle, working with the Grain

<hr/>

[5] We also note that insofar as this evidence could alone support a claim for a violation of the PSA, such a claim would likely be precluded by the statute of limitations. We decline to rule on this issue, but we note that other circuits have applied a four year statute of limitations to PSA claims and this evidence does not create an issue of fact during the four years prior to 2001, when Mims filed this claim. See Jackson v. Swift, 53 F.3d 1452, 1460 (8th Cir. 1995) (holding that district court did not err by applying Sherman Act's four-year statute of

Inspection, Packers and Stockyards Administration, modified its problematic weighing procedures, reimbursed growers who may have been underpaid (including Mims), and took a loss on growers who were potentially overpaid. Cagle disclosed the results to growers, and Mims does not produce any evidence indicating that his compensation was insufficient.

Finally, Mims argues that the district court erred by granting summary judgment on his PSA claims because the arbitration contract that was offered by Cagle was unconscionable and constituted a "bait and switch." Mims' argument is that he received periodic pay increases in 1994 and 1997 pursuant to the same type of contract that he was provided initially, but that in order to receive the pay increase in 1999, he had to sign the contract with the arbitration clause, which he refused to do. This is hardly a "bait and switch" scheme. Mims' original contract did not suggest he would receive periodic pay increases, and there is nothing to indicate that Cagle knew it might provide the option of the arbitration contract in 1994 when it originally contracted with Mims. Additionally, Mims provides nothing to suggest that the offer of the contract itself was unconscionable, other than that he lost the benefit of a pay increase because he refused to sign it.

_____

limitations, rather than two-year limitations period of Agricultural Fair Practices Act ("AFPA") to claimed PSA violations).

## B. Fraud Claim

Mims argues that the district court improperly granted summary judgment on Mims' fraud claims because Cagle required appointments to watch the weighing process, "kept no records of incidents of improper weighing and concealed its practices by sending false statements to growers." Mims further argues that Cagle committed fraud in its feed practices and by decreasing the number of birds placed on his farm from the number originally promised.

Mims cannot produce evidence that Cagle underpaid him for his flocks other than his hunch that some flocks weighed more than indicated on the statement provided by Cagle. Similarly, Mims does not provide evidence suggesting that his feed settlements were improper such that he can support an inference of fraud. The only false representation Mims cites to is testimony by Bennie Morris, who indicated some problems with Cagle's weighing procedures, mostly before 1996. Yet Morris expressly testified that Cagle made significant efforts to stop the problematic weighing procedures and did not authorize them. Accordingly, Mims did not create a genuine issue of material fact on his fraud claim and the district court properly granted summary judgment.

## C. Georgia RICO Claim

Mims argues that the district court erred by granting summary judgment to Cagle on his claim pursuant to the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO Act"). The Georgia RICO Act states that it "is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." Ga. Code Ann. § 16-14-4 (2004). Mims produces no evidence specific to this claim, and he fails to create a genuine issue of material fact for the same reasons he failed to create an issue in his fraud claims.

D. Promissory Estoppel/Fraud In the Inducement Claim

Mims argues that Cagle engaged in fraud in the inducement in 1994 by indicating 25,000 birds would be placed in his farm. This claim is wholly precluded by the merger clause of the contract. In Georgia, "[a]s a matter of law, a valid merger clause executed by two or more parties in an arm's length transaction precludes any subsequent claim of deceit based upon pre-contractual representations." First Data POS, Inc. v. Willis, 546 S.E.2d 781, 785 (Ga. 2001).

Similarly, Mims cannot maintain a claim for promissory estoppel. The contract between Mims and Cagle stated:

This Agreement constitutes the entire agreement between

13

the parties and includes all promises and representations, express or implied, made by the Company and the Producer and by either of them. Any prior oral or written representations not expressly set forth in this Agreement are hereby cancelled and are no longer of any force or effect.

Georgia courts have consistently held that plaintiffs cannot maintain a claim of promissory estoppel based on pre-contractual promises where the contract expressly cancels those promises or makes reliance on them unreasonable. See W.R. Grace & Company-Conn. v. Taco Tico Acquisition Corp., 454 S.E.2d 789, 791 (Ga. App. 1995) ("This court has consistently held that disclaimers in contracts prevent justifiable reliance on other representations purportedly made by the parties; we perceive no difference between reasonable reliance in promissory estoppel cases and justifiable reliance in other cases sufficient to warrant a different result." (Internal citations omitted)).

E. Agricultural Fair Practices Act

Next, Mims argues that the district court erred by granting summary judgment to Cagle on his claim pursuant to the Agricultural Fair Practices Act, 7 U.S.C. § 2301 et. seq ("AFPA"). The AFPA makes it illegal to discriminate against a grower in a growers' association, as well as to coerce or intimidate a grower with respect to an association. 7 U.S.C. § 2303. Similar to his PSA claim,

14

Mims failed to produce evidence on this claim creating a genuine issue of material fact that Cagle discriminated, coerced, or intimidated him with respect to his membership in a growers' association.

F. Breach of Contract Claim

Finally, Mims argues that the district court erred by granting summary judgment to Cagle on his breach of contract claim. Mims does not point to any specific provision in the contract that was breached. In his deposition, Mims acknowledged that he understood when he signed the contract that it made no promises as to specific numbers of birds to be placed, the numbers of flocks per year, or the types of birds, and that it contained no income or expense figures. In fact, Cagle increased the payment it paid per pound during the life of the contracts, and Mims earned near the projected amount during the life of the contracts. Mims states that if he received bad chickens, that constitutes a breach of contract. He has failed to show that he received more than his fair share of weaker birds, and thus has failed to create a genuine issue of fact as to a breach of contract. Mims does not flesh out what is reasonable to expect, which provisions of the contract were violated, and which flocks violated the contracts. Therefore, the district court properly granted summary judgment.

## III. CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment is

**AFFIRMED.**