EMILIO M. GARZA, Circuit Judge,
with whom
E. GRADY JOLLY, RHESA H. BARKSDALE, DENNIS, PRADO, JENNIFER W. ELROD and HAYNES, Circuit Judges, join, dissenting:
This appeal presents a single narrow question, certified to us by the district court pursuant to 28 U.S.C. § 1292(b): whether a plaintiff must prove an adverse effect on competition to prevail in a suit alleging a violation of Packers and Stockyards Act Sections 202(a) and (b), 7 U.S.C. § 192(a) and (b), (“PSA”). The PSA provides:
It shall be unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to:
(a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or
(b) Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect; or
(c) Sell or otherwise transfer to or for any other packer, swine contractor, or any live poultry dealer, or buy or otherwise receive from or for any other packer, swine contractor, or any live poultry dealer, any article for the purpose or with the effect of apportioning the supply between any such persons, if such apportionment has the tendency or effect of re *372 straining commerce or of creating a monopoly; or
(d) Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or
(e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or
(f) Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, or (2) to apportion purchases or sales of any article; or (3) to manipulate or control prices; or
(g) Conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a), (b), (c), (d), or (e) of this section.
7 U.S.C. § 192 (emphasis added). Because the unambiguous language of § 192 leads me to believe that § 192(a) and (b) do not require a showing of competitive injury, I respectfully dissent.
I
Plaintiffs-Appellees Cody Wheeler, Don Davis, and Davey Williams (together, the “Growers”) are farmers who grow chickens known as “broilers” for Defendant-Appellant Pilgrim’s Pride Corporation (“PPC”), a processor and dealer referred to as an “integrator” in the chicken industry. The Growers and PPC operate within a contractual relationship whereby PPC provides the Growers with the chicks, feed, and supplies required to raise chickens. In exchange, the Growers care for the chickens until they reach maturity, at which time they are returned to PPC. The chicks, maturing chickens, feed, and medicine remain the property of PPC at all times. This is known as the “grow-out” process. It takes approximately two months to grow-out a flock. The Growers’ operations (and the operations of other growers) are geographically clustered into areas called “complexes.”[1] PPC compensates the Growers under a “tournament system.” In essence, PPC ranks the Growers against one another and against the other growers operating in their complex. PPC then compensates the Growers based on the quality of their broilers, the number that survive the grow-out process, and the amount of feed and supplies the Growers used.
At least one grower operates under a different system from the Growers. Lonnie “Bo” Pilgrim (“Mr. Pilgrim”), PPC’s founder and chairman, purchases chicks, feed, and supplies from PPC rather than having them consigned to him. Operating in a different complex from the Growers, Mr. Pilgrim then raises the chickens at his farm and sells them back to PPC. Rather than compensating Mr. Pilgrim under the tournament system, PPC pays Mr. Pilgrim the lesser of a weekly quoted market price *373 or 102% of his costs. According to the Growers’ pleadings, Mr. Pilgrim’s arrangement yields him higher compensation than they receive. The Growers further allege that PPC refused to offer them growing arrangements similar to Mr. Pilgrim’s.
The Growers sued PPC under the PSA. Specifically, the Growers alleged that PPC’s refusal to afford them an opportunity to operate under the same terms as an insider, is “unfair and unjustly discriminatory” and affords Mr. Pilgrim an “undue or unreasonable preference or advantage” in violation of § 192(a) and (b).[2] The Growers raised additional claims against PPC, as well, that need not be described in detail for the purposes of the appeal. PPC moved for summary judgment arguing that the Growers did not allege an adverse effect on competition, as required to prevail under § 192(a) and (b). The district court found no such requirement in the PSA and denied the motion for summary judgment. Pursuant to 28 U.S.C. § 1292(b), the district court then entered an order certifying the following issue for appeal: whether a plaintiff must prove an adverse effect on competition in order to prevail under 7 U.S.C. § 192(a) and (b).
A panel of this court affirmed the district court’s order. Wheeler v. Pilgrim’s Pride Corp., 536 F.3d 455 (5th Cir.2008). The panel held that “the language of sections 192(a)-(b) is plain, clear, and unambiguous, and ... it does not require the Growers to prove an adverse effect on competition.” Id. at 460. It also addressed the PSA’s legislative history, not because it was necessary or proper in order to construe the statute, but because it was the panel’s “point of departure” from other circuit courts that have held an adverse effect on competition is required. Id. at 458, 461-62. The panel concluded that the legislative history does “not paint a clear picture of Congress’s intent,” id. at 462, and that it may be read to support the proposition that § 192(a) and (b) do not require a plaintiff to prove an adverse effect on competition. Id. at 461. Judge Reavley dissented stating:
Sections 192(a) and (b) of the Packers and Stockyards Act may be read differently, and this panel majority reading is certainly reasonable. However, I incline to the meaning given “unfair” by the Tenth Circuit in Been v. O.K. Indus. Inc., 495 F.3d 1217 (10th Cir.2007) and, in any event, would not create a circuit split after so many contrary circuit decisions over many years.
Id. at 462-63 (Reavley, J., dissenting).
PPC petitioned the court for rehearing en banc. The court granted the petition and ordered that the appeal be reheard en banc. The parties and a number of amici curia submitted briefs.[3] Following the en *374 banc rehearing, the court voted to reverse the district court, holding that a competitive injury must be shown in order to state a claim under § 192(a) and (b). Because I believe that no such showing is required, I dissent.
II
Proper statutory analysis begins with the plain text of the statute. See Permanent Mission of India to the United Nations v. City of New York, 551 U.S. 193, 127 S.Ct. 2352, 2356, 168 L.Ed.2d 85 (2007) (“We begin, as always, with the text of the statute.”) (citation omitted); Watt v. Alaska, 451 U.S. 259, 265, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981) (“The starting point in every case involving construction of a statute is the language itself.”) (quotation omitted); see also In re Rogers, 513 F.3d 212, 225 (5th Cir.2008). “It is well established that when a statute’s language is plain, the sole function of the courts ... is to enforce it according to its terms.” Lamie v. U.S. Trustee, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (internal quotation marks and citation omitted). Section 192(a) prohibits “unfair, unjustly discriminatory, or deceptive” practices or devices. Section 192(b) prohibits “undue or unreasonable” preferences, advantages, or disadvantages. Neither section contains language limiting its application to only those acts or devices, which have an adverse effect on competition, such as “restraining commerce.” Under well-settled principles, courts must refrain from reading additional terms, such as those that would require an adverse effect on competition, into these sections. See Lamie, 540 U.S. at 538, 124 S.Ct. 1023 (holding that if the text evinces “a plain, nonabsurd meaning” then the court should not “read an absent word into the statute”); see also Bates v. United States, 522 U.S. 23, 29, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997) (holding that courts “ordinarily” should “resist reading words or elements into a statute that do not appear on its face”).
The remaining parts of § 192 further support the view that subsections (a) and (b) do not require a plaintiff to prove an adverse effect on competition. Subsections (c)-(e), unlike subsections (a) and (b), prohibit only those acts, which have the effect of “restraining commerce” or which produce another common antitrust injury, such as “creating a monopoly.” If Congress had intended to limit the scope of subsections (a) and (b) to prohibit only those acts with the effect of “restraining commerce,” it could have included the same language it employed in subsections (c) -(e). Congress did not. This omission is strong evidence that Congress did not intend subsections (a) and (b) to require a plaintiff to prove an adverse effect on competition. See Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (“ ‘Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.’ ” (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir.1972))).[4] Simi *375 larly, if Congress had intended for the courts to read “restraining commerce” into every section of the PSA, then there is no reason why Congress would have included “restraining commerce” only in subsections (c)-(e). By judicially engrafting an adverse effect on competition requirement onto subsections (a) and (b) when Congress intentionally omitted one, the majority oversteps its proper role of interpreting the statute as written. See Wong Kim Bo, 472 F.2d at 722.
Other words used in subsections (a) and (b) further rebut a construction requiring competitive injury. For example, subsection (a) makes it unlawful to engage in or use any “deceptive practice.” It defies common sense that Congress meant to allow some deceptive practices, so long as they did not adversely affect competition, while prohibiting others that did impact competition. If the majority is correct to construe subsection (a) to require competitive injury, then deceptive practices that do not adversely affect competition are permissible under the PSA. In light of the plain language of subsections (a) and (b), this makes no sense: the prohibitions listed in subsections (a) and (b) are stated as absolute bans, unlike the prohibitions listed in subsections (c) through (e), which bar conduct only if it adversely affects competition. Indeed, subsection (b) prohibits unreasonable preferences or advantages, and undue or unreasonable prejudice or disadvantage, “in any respect.” This language, creating an unqualified prohibition of listed practices, is inconsistent with, and would be rendered superfluous by, a qualification that only those listed practices that adversely affect competition are prohibited. It is a basic precept of statutory construction that we should give effect to every clause and word of a statute where possible and should not construe statutes in a way that renders words or clauses superfluous. TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001).
Under the majority’s reading, Congress did not need to include specific anticompetitive language in any subsection because it effectively limited the PSA to competitive injury through a series of committee discussions and house reports. This of course begs the question why Congress chose to include any anticompetitive language at all if it was so clear that competitive harm permeated the entire statute. By holding that the subsections with no mention of competitive harm nonetheless require a showing of competitive injury, the majority renders superfluous the express anticompetitive language in subsections (c)-(e). Courts should, however, attempt to give effect to every clause and word of a statute. TRW Inc., 534 U.S. at 31, 122 S.Ct. 441.
The violence wrought on the statute by the majority’s interpretation is even more clear when one considers subsection (e), which broadly prohibits persons from engaging “in any course of business or ... any act” that has as its purpose or effect “manipulating or controlling prices, or of creating a monopoly ... or of restraining commerce.” 7 U.S.C. § 192(e) (emphasis added). If, as the majority holds, subsections (a) and (b) also require the specific prohibited conduct to affect competition, then those subsections are rendered superfluous in their entirety because they would be completely subsumed by subsection (e). Subsection (e) prohibits any act for the purpose or with the effect of manipulating or controlling prices or restraining commerce, which would cover all of the acts specified in subsections (a) and (b) if they also required an anticompetitive effect.
Borrowing from the Tenth Circuit’s opinion in Been v. O.K Industries, Inc., 495 F.3d 1217, 1229 (10th Cir.2007), PPC *376 tries to overcome this problem by suggesting that subsections (a) and (b) were meant as a “catch-all” for behavior not covered by subsections (c)-(e). But, it seems quite obvious that subsection (e), which prohibits any act for the purpose or with the effect of manipulating or controlling prices or restraining commerce, is the “catch-all” for the competitive injury sections. By prohibiting any act for the purpose or with the effect of manipulating or controlling prices or restraining commerce, subsection (e) reaches anticompetitive behavior not reached by the more specific anticompetitive provisions of subsections (c) and (d). On the other hand, as written, subsections (a) and (b) reach conduct that is clearly not reached by subsections (c)-(e), which are limited to anti-competitive behavior. For instance, a contract, such as the one at issue in this case, giving preferential treatment to the founder and largest shareholder of a company might well be “unfair” within the meaning of subsection (a), but not satisfy the “restraining commerce” requirement of subsections (c)-(e). Likewise, limiting an allegedly preferential pay system to company insiders without a valid business justification for doing so might constitute an “undue or unreasonable preference” within the meaning of subsection (b), even though the “restraining commerce” requirement of subsections (c)-(e) could not be met. The majority’s decision to follow Been in writing a competitive injury requirement into subsections (a) and (b) destroys their unique function in the name of creating a “catch-all” that already exists in subsection (e).
Looking beyond the text of § 192 to other parts of the PSA, I find further evidence that § 192(a) and (b) do not require a showing of competitive injury. For example, like § 192(a), § 213(a) prohibits covered entities from engaging in or using “any unfair, unjustly discriminatory, or deceptive practice or device .... ” 7 U.S.C. § 213(a). Although § 213(a) has the same language as § 192(a), courts have not construed it to require an adverse effect on competition.[5] For instance, in Bovman v. USDA, we stated that a failure to make prompt payment to a shipper by a person subject to the PSA “would be a proscribed deceptive practice under § 213(a).” 363 F.2d 81, 85 (5th Cir.1966). Failure to make prompt payment in no way involves competitive injury, yet it was found to be “unfair” under § 213(a). Because § 192(a) contains virtually identical language, it should not be construed differently. See, e.g., Powerex Corp. v. Reliant Energy Servs., Inc., 551 U.S. 224, 232, 127 S.Ct. 2411, 168 L.Ed.2d 112 (2007) (“A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.”). Further, Congress provides an example of *377 an “unfair practice” in § 228b-l(b), which concerns prompt payment by live poultry dealers in cash sales. It provides that “any delay or attempt to delay” collection of funds in such sales “shall be considered an ‘unfair practice’ in violation of this chapter. Nothing in this section shall be deemed to limit the meaning of the term ‘unfair practice’ as used in this chapter.” 7 U.S.C. § 228b-l(b). The failure to pay one grower promptly would have no apparent adverse effect on competition; yet Congress expressly states that it is an “unfair practice” under the PSA. Because identical words within the same statute should be given the same meaning, “unfair practice” in § 192(a) likewise cannot require competitive injury. See Powerex Corp., 551 U.S. at 232, 127 S.Ct. 2411.
Neither PPC, the majority, nor the other circuits have provided an alternative reading of the plain text of § 192(a) and (b), instead choosing to divine the meaning of the PSA from selected portions of its legislative history and cases based on that history. The plain language of the PSA, however, is clear. Some subsections contain “restraining commerce” language and some do not. We have to give effect to this difference. See Wong Kim Bo, 472 F.2d at 722. The most natural reading is that those subsections with the “restraining commerce” language require a competitive injury and those without it do not. Because the majority’s construction of the PSA avoids this straightforward conclusion only by reading absent terms into the statute, it should be rejected. The district court correctly held that the language of § 192(a) and (b) is plain, clear, and unambiguous, and that it does not require the Growers to prove an adverse effect on competition. Because § 192(a) and (b) plainly, clearly, and unambiguously do not require an adverse effect on competition, I would so hold and go no further. See Cooper Indus., Inc. v. Aviall Servs., Inc., 543 U.S. 157, 167, 125 S.Ct. 577, 160 L.Ed.2d 548 (2004) (“Given the clear meaning of the text, there is no need to ... consult the purpose of [the statute] at all.”); Lamie, 540 U.S. at 534, 124 S.Ct. 1023 (holding that unless a statute is “ambiguous on the point at issue,” a court should not resort to legislative history in interpreting it); Rogers, 513 F.3d at 225-26 (citing Carrieri v. Jobs.com Inc., 393 F.3d 508, 518-19 (5th Cir.2004)) (“Only after application of the principles of statutory construction, including the canons of construction, and after a conclusion that the statute is ambiguous may the court turn to legislative history.”); Guilzon v. C.I.R., 985 F.2d 819, 823 n. 11 (5th Cir.1993) (citation omitted) (“Fifth Circuit law is crystal clear that when, as here, the language of a statute is unambiguous, this Court has no need to and will not defer to extrinsic aids or legislative history.”).
Ill
The majority and the circuits on which it relies forsake the plain language approach, and instead delve into the historical circumstances surrounding the passage of the statute to determine its meaning. This methodology is directly opposed to our case law and the case law of the Supreme Court. See Aviall Servs., Inc., 543 U.S. at 159, 125 S.Ct. 577; Hammack v. Baroid Corp., 142 F.3d 266, 271 (5th Cir.1998) (noting that “theories of underlying intent or purpose cannot trump statutory language”). Because history and policy considerations lend support to conflicting interpretations, such an approach “creates more confusion than clarity about the congressional intent.” Lamie, 540 U.S. at 539, 124 S.Ct. 1023. This confusion, unlike the plain language, is not a proper basis from which to construe the statute.
*378 To illustrate the point, one only need consider the two primary “legislative history” and “policy” bases upon which our sister circuits rest their findings of an adverse effect on competition requirement. First, they rely on H.R. 85-1048 (1958), which states: “the primary purpose of [the PSA] is to assure fair competition and fair trade practices in livestock marketing and in the meatpacking industry.” Id. at 1. Second, they rely on Stafford v. Wallace, 258 U.S. 495, 514-15, 42 S.Ct. 397, 66 L.Ed. 735 (1922), which observed that the “chief evil” Congress feared in passing the PSA was the monopoly of meat industry packers. Most obviously, Congress spoke of assuring fair competition as the PSA’s “primary” purpose, not as the PSA’s only purpose, and the Supreme Court spoke of monopoly as the “chief’ evil against which the PSA protects, not as the “only” evil. Thus, Stafford is no authority for foreclosing the view that the PSA protects against harms that have no adverse effect on competition. See id. Moreover, a closer look at the House Report shows no intention to limit the PSA as much as other circuits argue.
The very passages of the House Report upon which our sister circuits rely may be read to support the contrary proposition; namely, that § 192(a) and (b) do not require a plaintiff to prove an adverse effect on competition. First, the “primary purpose of this Act is to assure fair competition and fair trade practices.” H.R. 85-1048 at 1 (1957), reprinted in 1958 U.S.S.C.A.N. 5212, 5213 (emphasis added). In the very sentence upon which the other circuits place so much emphasis is evidence of a second purpose that does not involve competitive harm. Even if it were true that fair competition was the PSA’s “primary purpose,” the House described other purposes as well:
The primary purpose of this Act is to assure fair competition and fair trade practices in livestock marketing and in the meatpacking industry. The objective is to safeguard farmers and ranchers against receiving less than the true market value of their livestock and to protect consumers against unfair business practices in the marketing of meats, poultry, etc. Protection is also provided to members of the livestock marketing and meat industries from unfair, deceptive, unjustly discriminatory, and monopolistic practices of competitors, large or small.
The act provides that meatpackers subject to its provisions shall not engage in practices that restrain commerce or create monopoly. They are prohibited from buying or selling any article for the purpose of or with the effect of manipulating or controlling prices in commerce. They are also prohibited from engaging in any unfair, deceptive, or unjustly discriminatory practice or device in the conduct of their business, or conspiring, combining, agreeing, or arranging with other persons to do any of these acts.
H.R.Rep. No. 85-1048 at 1-2 (emphasis added). While these passages support the view that the PSA’s primary purpose is to protect fan* competition, the PSA goes further. It also was intended to “protect consumers from unfair business practices,”[6] to protect members of the livestock *379 marketing and meat industries from “unfair, deceptive, and unjustly discriminatory” practices, and to prohibit meatpackers, more generally, from “engaging in any unfair, deceptive, or unjustly discriminatory practice or device in the conduct of their business.” Id. Indeed, by using “also prohibited” to separate “unfair, deceptive, or unjustly discriminatory practice and device” from language describing injuries to competition such as “restrain[ing] commerce,” “creating] monopoly,” and “manipulating or controlling prices,” Congress evinced its intent for the PSA to sweep more broadly than only those injuries which have an adverse effect on competition. Id.; see Spencer Livestock Comm’n Co. v. Dep’t. of Agric., 841 F.2d 1451, 1455 (9th Cir.1988) (observing that while the PSA’s primary purpose was to assure fair competition and prevent monopolistic practices, it also sought to provide protection from unfair and deceptive business tactics).
These passages from the House Report do not paint the clear picture, argued by the majority, that Congress had a singular purpose in passing the PSA. Instead, they reveal uncertainty. That is the point. “These uncertainties illustrate the difficulty of relying on legislative history here and the advantage of our determination to rest our holding on the statutory text.” Lamie, 540 U.S. at 542, 124 S.Ct. 1023. Especially where Congress’s intentions and concerns are equivocal, it is better to be guided by plain language and the basic precept: “it is ultimately the provisions of our laws rather than the principal [or the ‘primary’ or the ‘chief] concerns of our legislators by which we are governed.” Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).
rv
In reading an adverse effect on competition requirement into § 192(a) and (b), the other circuits have departed from this basic rule. The majority now decides to follow suit, relying on, among others, recent decisions from the Tenth and Eleventh Circuits: London, Pickett, and Been.[7] These decisions reached beyond the PSA’s clear and unambiguous text, choosing instead to be guided by its legislative history and policy considerations. They should have been guided by the text. See Cooper, 543 U.S. at 167, 125 S.Ct. 577; Lamie, 540 U.S. at 534, 124 S.Ct. 1023; Rogers, 513 F.3d at 225-26; Guilzon, 985 F.2d at 823 n. 11.
In London, the court ignored the “cardinal canon” of statutory construction: follow the unambiguous words of the statute.[8] See Connecticut Nat. Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (“[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others ... a legislature says in a statute what it means and means in a statute what it says there.”). Instead, the court chose to be guided by the PSA’s legislative history, “antitrust ancestry,” and “policy considerations.” London, 410 F.3d at 1307. Even *380 so, its analysis of the purposes of the statute ignores portion of the legislative history and case law. See id. at 1302 (citing selected portions of H.R.Rep. No. 85-1048 and Stafford while ignoring other parts of that report and cases that state another purpose of the PSA was to protect producers from deceptive and unfair business practices).[9]
Been’s logic is flawed because it too never properly analyzed the plain text of the statute and because it relied on the unsound analysis in London. Been, 495 F.3d at 1228-29. As in London, Been failed to address portions of the PSA’s legislative history and Stafford that support a conclusion that subsections (a) and (b) do not require competitive injury. Id. at 1232-33. Been also strained to distinguish other Tenth Circuit cases that came to contrary conclusions. Id. at 1230 (attempting to distinguish Peterman v. USDA, 770 F.2d 888 (10th Cir.1985), which held that a “bait and switch” tactic violated § 192(a)’s ban on deceptive practice without mention of competitive injury). Further, Been focuses on the PSA’s backdrop in antitrust laws, but never addresses why Congress enacted the PSA if it were intended only to mirror pre-existing laws. Id. at 1228. But see In re Western Cattle Co., 47 Agric. Dec. 992, 1052 (1988) (rejecting arguments that would treat the PSA as “nothing more than a mirror of the antitrust laws”). Lastly, where Been did briefly address the statutory text, interpreting § 192(a) to be a catch-all, 495 F.3d at 1229, its analysis is simply wrong as explained above. See supra, Part II, pp. 8-9.
Been, Pickett, and London engage in almost no analysis of the plain language of the PSA, instead preferring to focus on legislative history and purpose. Although the opinions purport to be rich with legislative history and purpose, their analysis ignores sections of the legislative history that support an alternate reading of the PSA. What little textual analysis they do perform, suggesting that subsection (a) is the “catch-all” for the PSA, is wrong. Because nothing in their holdings warrants a departure from the plain language of the statute, the majority’s decision to follow our sister circuits is imprudent. See Sobranes Recovery Pool I, LLC v. Todd & Hughes Constr. Corp., 509 F.3d 216, 226 (5th Cir.2007).
V
While the Tenth {Been) and Eleventh {Pickett and London) Circuits[10] have held that a competitive injury is required under the PSA, the other circuits have not definitively held that a showing of competitive *381 injury is required. In arguing that all the circuit cases for the last ninety years have uniformly required a showing of competitive injury, the majority misconstrues cases such as De Jong Packing Co. v. USDA, Farrow v. USDA, IBP, Inc. v. Glickman, and Armour and Company v. United States. Although those courts held conduct that injured competition would violate the PSA, they did not hold that such injury is a required element in every case.
For example, the Ninth Circuit in De Jong Packing Co. applied an antitrust analysis based on the statute’s antitrust background but did not hold that the PSA only prohibits anticompetitive conduct. 618 F.2d 1329, 1336-37 (9th Cir.1980). There, the conduct in question involved “concerted efforts to coerce a change in market practices,” which facially appeared to be anticompetitive. It is not surprising that the court discussed competitive harm when dealing with a facially anticompetitive violation. The court held that a “reasonable likelihood” that harm to the market would occur was sufficient to find a violation of § 192(a). Id. A more recent Ninth Circuit Case, Spencer Livestock Comm’n Co., held that the PSA “was not intended merely to prevent monopolistic practices, but also to protect the livestock market from unfair and deceptive business tactics.” 841 F.2d at 1455 (finding that the challenged act was a deceptive practice under § 213 regardless of whether it harmed consumers or competitors).
Farroto is often cited for the proposition that a practice must injure or be likely to injure competition in order to be considered unfair under the PSA. 760 F.2d 211 (8th Cir.1985). In fact, the court held that “[a] practice is ‘unfair’ under § 213(a) if it injures or is likely to injure competition.” Id. at 214 (citing DeJong Packing Co., 618 F.2d at 1336-37). In context, this holding does not necessarily imply that injury or likely injury is necessary for a violation. The court was addressing conduct that appeared to fall into an antitrust framework (an agreement between two livestock dealers not to compete against each other for purchases at a certain auction), and the court’s discussion centered on the degree of evidence required (whether the harm had to be actual or could be merely potential) and not the type of harm (competitive or otherwise) that the statute required. A discussion of competitive injury in the context of a facially anticompetitive violation does not ineluctably lead to the conclusion that the PSA is limited to anticompetitive injury. The most recent Eighth Circuit case to address the issue, IBP v. Glickman, was similarly equivocal; it held that a “right of first refusal” agreement between a group of feedlots and a meatpacking company, which did give some preference to the meatpaeker but did not do so “unduly, as required for a violation of the Act,” did not “potentially suppress or reduce competition sufficient to be proscribed by the Act.” 187 F.3d 974, 977 (8th Cir.1999). Holding that a violation that potentially suppresses or reduces competition would be sufficient to be proscribed by the PSA does not mandate the converse. While Farrow and Glickman hold that an act that injures competition may be unfair under the PSA, they do not hold that all unfair acts must injure competition.
A third Eighth Circuit case cited by PPC offers even less support for the proposition that the PSA requires a competitive injury showing. In Jackson v. Swift Eckrich, Inc., the court affirmed the district court’s holding that, as a matter of law, “the claimed actions ... were neither deceptive or injurious to competition, nor were they unfair, unjust or unreasonable.” 53 F.3d 1452, 1458 (8th Cir.1995) (quoting Jackson v. Swift-Eckrich, Inc., 836 F.Supp. 1447, 1456 (W.D.Ark.1993) (em *382 phasis added)). The district and circuit courts thus separated “unfair, unjust or unreasonable” actions from those “deceptive or injurious to competition,” implying that a showing of either was necessary, but not necessarily both. Although both courts ultimately found that the defendant’s actions did not violate § 192(a) and (b) , neither even mentioned competitive injury in its discussion.
In Armour, the Seventh Circuit focused on the lack of competitive harm in deciding that a 50-cent rebate to purchasers of thick-cut bacon was not “unfair” under § 192(a) and (b). 402 F.2d 712 (7th Cir.1968). Given that the allegations involved price cutting, the focus on competitive harm is again not surprising. When the alleged unfairness involves price cutting it necessarily requires an inquiry into predatory intent or competitive injury because it is often difficult to distinguish between predatory and healthy pricing practices. Id. at 720. In fact, a claim alleging price cutting fits much better within subsection (c) , which does require competitive injury, than it does subsection (a). ArmowSs analysis is thus muddied by the fact that it involves a claim that should have been brought under one of the competitive subsections. Armour also suffers from many of the same problems that plague London. For instance, it failed to construe the plain language of the statute and instead attempted to determine the purpose of the PSA viewed through an antitrust lens. Id. at 722 (construing the PSA as if it were merely another antitrust law). Furthermore, the Seventh Circuit’s PSA jurisprudence is far from uniform or clear. See Schumacher v. Tyson Fresh Meats, Inc., 434 F.Supp.2d 748, 753 (D.S.D.2006).
In short, although several circuits have held that practices that harm competition are unfair within the meaning of the PSA, these holdings do not necessarily support this court’s holding that § 192(a) and (b) require a showing of competitive injury. Even if they did, the holdings of other circuits do not relieve this circuit of its responsibility to attempt to reach the correct result based on the well-established methods of statutory interpretation. Predictability may be important, but it does not trump the correct result. See Aviall Servs., 543 U.S. 157, 125 S.Ct. 577, 160 L.Ed.2d 548 (relying on the plain text to reverse scores of contrary circuit decisions).
VI
As Judge Hartz explained in his well-reasoned concurrence, Been, 495 F.3d at 1241 (Hartz, J., concurring/dissenting), a construction of the PSA that does not require competitive injury is further bolstered by the Supreme Court’s interpretation of similar language in the Federal Trade Commission Act (“FTC Act”). Using language similar to § 192(a) of the PSA, § 45(a)(1) of the FTC Act provides: “unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.” 15 U.S.C. § 45(a)(1); see Armour, 402 F.2d at 722 (“Section 202(a) should be read liberally enough to take care of the types of anti-competitive practices properly deemed ‘unfair’ by the Federal Trade Commission (15 U.S.C. § 45) and also to reach any of the special mischiefs and injuries inherent in livestock and poultry traffic.”). Comparison of the PSA to the FTC Act is warranted because the PSA is an offspring of the FTC Act. Been, 495 F.3d at 1241 (Hartz, J., concurring'dissenting). The PSA was enacted in 1921 because the antitrust laws and the FTC Act alone were deemed inadequate in dealing with the meat packing industry. 1 John H. Davidson et ah, AG *383 RICULTURAL LAW § 3.02, at 187 (1981).
In FTC v. Sperry & Hutchinson Co., the U.S. Supreme Court rejected the argument that this similarly worded provision of the FTC Act required proof of an anti-competitive effect. 405 U.S. 233, 239-40, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972). The Federal Trade Commission (“FTC”) had entered an order prohibiting certain actions of Sperry & Hutchinson (S&H), claiming it had violated the FTC Act by attempting “to suppress the operation of trading stamp exchanges and other ‘free and open’ redemption of stamps.” Id. at 234, 92 S.Ct. 898. S&H challenged the order. The Fifth Circuit vacated the order and held that the FTC could halt only conduct that “violated either the letter or the spirit of the antitrust laws.” Id. at 235, 92 S.Ct. 898. The FTC appealed to the Supreme Court and there admitted that S&H’s conduct violated neither the letter nor spirit of the antitrust laws; but rather, it contended that the power given to the FTC by the FTC Act was not limited to antitrust violations. Id. at 239, 92 S.Ct. 898. The Supreme Court agreed, holding that the FTC Act “empower[s] the [FTC] to proscribe practices as unfair or deceptive in their effect upon consumers regardless of their nature or quality as competitive practices or their effect on competition.” Id. (emphasis added). This flexible approach in Sperry & Hutchinson also reaffirmed the Court’s earlier holding that “[t]he point where a method of competition becomes ‘unfair’ within the meaning of the Act will often turn on the exigencies of a particular situation, trade practices, or the practical requirements of the business in question.” FTC v. Motion Picture Adv. Serv. Co., 344 U.S. 392, 396, 73 S.Ct. 361, 97 L.Ed. 426 (1953).
The history of the Court’s interpretations of the FTC Act and Sperry & Hutchinson’s comments on that history have particular implications for interpreting the PSA. The original version of the FTC Act, enacted in 1914, did not include the language empowering the FTC to prevent “unfair or deceptive acts or practices in commerce”; the Act provided power only to prevent “unfair methods of competition in commerce.”[11] Federal Trade Commission Act, Pub.L. No. 63-203, § 5, 38 Stat. 717, 719 (1914). In 1920, the year before enactment of the PSA, the Supreme Court adopted a limiting interpretation of “unfair methods of competition,” restricting the covered practices to those “heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly.” FTC v. Gratz, 253 U.S. 421, 427, 40 S.Ct. 572, 64 L.Ed. 993 (1920); see Sperry & Hutchinson, 405 U.S. at 241, 92 S.Ct. 898. Later, however, the Supreme Court changed course in FTC v. R.F. Keppel & Bro., Inc., 291 U.S. 304, 54 S.Ct. 423, 78 L.Ed. 814 (1934). See Sperry & Hutchinson, 405 U.S. at 242-43, 92 S.Ct. 898. In Keppel, the Court held a marketing scheme could be unfair even though it did not have “anticompetitive consequences after the manner of the antitrust laws.” 405 U.S. at 244, 92 S.Ct. 898. The Court then noted that the Keppel decision’s “perspective” of the FTC Act “was legislatively confirmed” in 1938 when Congress amended the Act by adding the phrase “unfair or deceptive acts or practices” to the original ban on “unfair methods of competition.” *384 Id. (internal quotation marks omitted). The Court thought that the “unfair or deceptive acts or practices” language did not require anticompetitive conduct. See id. The original language in § 192(a) of the PSA made it unlawful to “[e]ngage in or use any unfair, unjustly discriminatory, or deceptive practice or device in commerce.” Pub.L. No. 67-51, § 202, 42 Stat. 161. The “unfair ... practice ... in commerce” language is the very language construed by the Supreme Court in Sperry & Hutchinson as not requiring an “effect on competition.” 405 U.S. at 239, 92 S.Ct. 898. The language of PSA § 192(a) more clearly omits a competitive-effect requirement than does the FTC Act language construed in Keppel. Been, 495 F.3d at 1241 (Hartz, J., coneurring/dissenting) (noting that § 192(a) does not use the FTC Act’s language “unfair methods of competition”). Thus, in construing substantially similar language in the FTC Act, the Supreme Court squarely rejected the argument that the FTC cannot prohibit a practice as being unfair unless there is proof of an anticompetitive effect. And the PSA grants broader authority to regulate than previously enacted statutes, including the FTC Act. H.R. REP. NO. 67-77, at 2 (1921) (noting that the PSA “is a most comprehensive measure and extends farther than any previous law in the regulation of private business, in time of peace, except possibly the interstate commerce act”). If the same language under the FTC Act does not require an adverse impact on competition, then it should not be construed differently under the PSA.
VII
PPC makes a number of policy arguments favoring a construction that requires competitive injury. First, following London and Been, PPC contends that the statutory text as written may require it to defend federal causes of action for claims that would otherwise have been state law issues. London, 410 F.3d at 1304; Been, 495 F.3d at 1229 (“Not to require a showing of competitive injury or the likelihood thereof would make a federal case out of every breach of contract.”). But the fact that a statute may burden live poultry dealers does not mean that it is improper; Congress could well have concluded that such burdens were justified to protect growers. Furthermore, the Supreme Court has previously refused to add narrowing language to a statute (RICO), despite the contention that the statute as written threatened to turn an abundance of garden-variety local disputes into violations of federal law. See Bridge v. Phoenix Bond & Indem. Corp., 553 U.S. 639, 128 S.Ct. 2131, 2145, 170 L.Ed.2d 1012 (2008). PPC also fears the effects of a “standardless” definition of “unfair.” However, to the degree that “unfair” is standardless, it is unlikely to remain so for long. Like most statutory terms, those within the PSA will receive definition and refinement through the language of the statute itself, agency adjudication, regulation, and judicial proceedings.[12] Here, the question of whether PPC’s different treatment of the Growers, on one hand, and Mr. *385 Pilgrim, on the other, was “unfair” or otherwise in violation of the statute should be determined on remand in the context of industry standards, the economic justifications for the actions, and the motives and actions of those concerned.[13]
An underlying flaw in all of PPC’s policy arguments is that they implicitly urge us not to construe the plain language of the statute, but instead, to substitute our own policy determinations for those of Congress. Courts, however, cannot take the place of Congress in deciding matters of policy. Tenn. Valley Auth. v. Hill, 437 U.S. 153, 194-95, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978); see also Moosa v. INS, 171 F.3d 994, 1009 (5th Cir.1999) (Courts “will not second-guess such policy choices properly made by the legislative branch”). A court’s “individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute.” Hill, 437 U.S. at 194, 98 S.Ct. 2279; see also Gen. Tel. Co. of Southwest v. United States, 449 F.2d 846, 859 (5th Cir.1971) (“The wisdom or expediency of a given law or regulation is not open to question in the courts.”). Because Congress’s mandate is expressed in unambiguous terms, this court should not act as a “committee of review” for Congress’s wisdom in enacting the PSA. Hill, 437 U.S. at 194-95, 98 S.Ct. 2279.
Furthermore, contrary to the majority’s suggestion, it is not reasonable to conclude that Congress’s failure to amend the PSA should be taken as silent ratification. Courts should “not expect Congress to make an affirmative move every time a lower court indulges in an erroneous interpretation.” United States v. Welden, 377 U.S. 95, 103 n. 12, 84 S.Ct. 1082, 12 L.Ed.2d 152 (1964) (citation omitted). “To explain the cause of non-action by Congress when Congress itself sheds no light is to venture into speculative unrealities ... [Courts] walk in quicksand when [they] try to find in the absence of corrective legislation a controlling legal principle.” Helvering v. Hallock, 309 U.S. 106, 120-21, 60 S.Ct. 444, 84 L.Ed. 604 (1940). As the Supreme Court has stated:
This Court has many times reconsidered statutory constructions that have been passively abided by Congress. Congressional inaction frequently betokens unawareness, preoccupation, or paralysis.
Zuber v. Allen, 396 U.S. 168, 185 n. 21, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969) (internal quotes omitted); see also Prostar v. Massachi 239 F.3d 669, 678 (5th Cir.2001) (“Inertia is endemic to the legislative process, rendering congressional inaction a problematic interpretive guide.”). By giving significance to Congressional silence, the majority improperly bases its decision on speculation rather than the plain text of the statute.
VIII
For the foregoing reasons, I respectfully dissent from the holding of the court. I would affirm the order of the district court.

. PPC’s broiler production operations are subdivided into numerous complexes, which are located in many different regions of the United States. Each "complex” has at least one pullet farm, breeder farm, hatchery, feed mill, and processing plant. Because PPC provides the feed, which is expensive to transport, it requires growers who raise broilers for a particular complex to be located within fifty miles of the complex and its feed mill.

. The section of the PSA relevant to this appeal is codified in the United States Code at 7 U.S.C. § 192. I refer, at times, to § 192(a) and (b) simply as (the "PSA”) or as ("subsections (a) and (b)”).

. The Government filed an amicus brief in this case arguing that the court should give deference to the USDA’s construction of the PSA. The USDA does not require a showing of competitive injury under § 192(a) or (b). Although the USDA is not entitled to Chevron deference because the PSA is unambiguous, the court should give "respect to the experience and expertise of the USDA regarding the PSA.” Been, 495 F.3d at 1239 (Hartz, J„ concurring/dissenting); see also United States v. Mead Corp., 533 U.S. 218, 227-28, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (Courts generally give considerable weight to an executive department’s construction of a statute it is entrusted to administer). The USDA "has consistently taken the position that in order to prove that any practice is 'unfair' under §§ 202(a) (7 U.S.C. § 192(a)) or 312(a) (7 U.S.C. § 213(a)) of the Act, it is not necessary to prove predatory intent, competitive injury, or likelihood of injury ....” In re Ozark County Cattle Co., 49 Agric. Dec. 336, 365 *374 (1990) (quoting In re Corn State Meat Co., 45 Agric. Dec. 995, 1023 (1986)); see also 1 John H. Davidson et al., Agricultural Law § 3.47, at 244 (1981).

. We consistently have applied this canon of construction since deciding Wong Kim Bo. See, e.g., Arif v. Mukasey, 509 F.3d 677, 681 (5th Cir.2007); Comacho v. Tex. Workforce Comm’n, 408 F.3d 229, 236 (5th Cir.2005); Nuovo Pignone, SpA v. Storman Asia M/V, 310 F.3d 374, 384 n. 16 (5th Cir.2002); United States v. Juvenile No. 1, 118 F.3d 298, 305 (5th Cir.1997); United States v. Shear, 962 F.2d 488, 490 (5th Cir.1992); In re Timbers of Inwood Forest Assocs., Ltd., 793 F.2d 1380, 1402 (5th Cir.1986).

. See, e.g., Butz v. Glover Livestock Comm’n, Co., 411 U.S. 182, 183-84, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973) (incorrect weighing of livestock violated, among other provisions, § 213(a)); Spencer Livestock Comm’n Co. v. Dept. of Agric., 841 F.2d 1451, 1454-55 (9th Cir.1988) (upholding a finding of a § 213(a) violation "where the evidence establishes a deceptive practice, whether or not it harmed consumers or competitors”); Peterman v. USDA, 770 F.2d 888, 890 (10th Cir.1985) ("bait-and-switch” was an "unfair and deceptive practice” under § 192(a)); Bosma v. USDA, 754 F.2d 804, 808-09 (9th Cir.1984) (market agent violated § 213(a) by failing to inform consignors that he was the actual purchaser of their livestock); Van Wyk v. Berg-land, 570 F.2d 701, 704-05 (8th Cir.1978) (failure to pay for livestock violated § 213(a)); United States v. Donahue Bros., 59 F.2d 1019, 1022-23 (8th Cir.1932) (commingling shippers’ funds was "unfair” and a violation of § 213 because the purpose of the "prohibition against unfair practices is to protect shippers”).

. In her concurrence, Chief Judge Jones attempts to distinguish the FTC Act, which the Supreme Court has interpreted not to require an adverse affect on competition, see Federal Trade Commission v. Sperry & Hutchinson Co., 405 U.S. 233, 92 S.Ct 898, 31 L.Ed.2d 170 (1972) (discussed infra), from the PSA by suggesting "that the FTC Act was intended by *379 Congress as both an antitrust and a consumer-protection statute” whereas the PSA was directed solely at antitrust. Given that one of the specifically enumerated purposes of the PSA was to "protect consumers from unfair business practices,” this supposed distinction does not, as Chief Judge Jones suggests, render Sperry & Hutchinson inapplicable.

. London v. Fieldale Farms Corp., 410 F.3d 1295 (11th Cir.2005); Pickett v. Tyson Fresh Meats, Inc., 420 F.3d 1272 (11th Cir.2005); Been, 495 F.3d 1217.

. Pickett merely followed London and, therefore, its construction of the PSA is flawed for the same reasons. See Pickett, 420 F.3d at 1279-80.

. See e.g., Spencer Livestock Comm’n Co. v. Dep’t of Agric., 841 F.2d 1451, 1455 (9th Cir.1988) (rejecting argument that the PSA requires proof of an anticompetitive effect, which the court found was based on an “incomplete understanding of the objectives of the Act”); Bosma v. USDA, 754 F.2d 804, 808 (9th Cir.1984); Rice v. Wilcox, 630 F.2d 586, 590 (8th Cir.1980); Van Wyk v. Bergland, 570 F.2d 701, 704 (8th Cir.1978); Solomon Valley Feedlot, Inc. v. Butz, 557 F.2d 717, 718 (10th Cir.1977); Swift & Co. v. United States, 393 F.2d 247, 253 (7th Cir.1968) (all reaching the same conclusion); Been, 495 F.3d at 1241-42 (Hartz, J., concurring/dissenting) (same).

. The Fourth Circuit is the remaining circuit to have held that a likely competitive effect is required to find a PSA violation, but it did so in a short unpublished opinion. In Philson v. Goldsboro Milling Co., 164 F.3d 625, 1998 WL 709324, 1998 U.S.App. LEXIS 24630, at *11 (4th Cir. Oct. 5, 1998) (unpublished), the court upheld the trial court’s jury instruction requiring proof of a likely effect on competition to find a § 192(a) violation. With no analysis, the court simply cited Farrow v. USDA, 760 F.2d 211, 215 (8th Cir.1985) and Parchman v. USDA, 852 F.2d 858, 864 (6th Cir.1988) (quoting Farrow) to support its conclusion.

. Notably, Chief Judge Jones’ "terms of art” discussion makes no mention of the distinction between "unfair method of competition” and "unfair or deceptive acts or practices” as used in the FTC Act. She glosses over this critical difference by collapsing "terms of art” with markedly different interpretations into a single generic term, "unfair.”

. For example, the USDA's interpretation of the PSA can provide some guidance. The Government noted in its amicus brief that the USDA agrees that a primary (but not the sole) purpose of the PSA is to foster competition and, for that reason, practices that have the potential to enhance efficiency should not be condemned as "unfair” under the PSA without consideration of competitive effects. This view was reflected in London, where the USDA took the position that the challenged act violated the statute specifically because it lacked a valid economic justification. The Secretary of the USDA has also issued regulations and policy statements clarifying § 192(a). See, e.g., 9 C.F.R. §§ 201.98-201.100, 201.108-1, 203.2(c), 203.7(c), 203.10.

. In her concurrence, Chief Judge Jones repeatedly states that the PSA cannot be read as prohibiting legitimate competitive activity or acts stemming from an honest and fair competitive motive. This point is in no way incompatible with the dissent’s reading of the PSA. As noted, PPC would have the opportunity on remand to show that giving Mr. Pilgrim a different contract than other growers was not "unfair” in the context of industry standards, the economic justifications for the actions, and the motives and actions of those concerned.